## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

ECOLAB INC. and ECOLAB USA INC., )
)
              Plaintiffs, )
)
v. )
)
DUBOIS CHEMICALS, INC., )
)
              Defendant. )
)

C.A. No: 1:21-CV-00567-RGA

**JURY TRIAL DEMANDED**

███████████████████

## DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS
## FRCP 12(c), SUMMARY JUDGMENT, AND *DAUBERT* MOTIONS

Dated: June 9, 2023

James M. Lennon (No. 4570)
DEVLIN LAW FIRM LLC
1526 Gilpin Avenue
Wilmington, DE 19806
(302) 449-9010
jlennon@devlinlawfirm.com

Lucas T. Elliot *(pro hac vice)*
FROST BROWN TODD LLP
150 3rd Avenue South, Suite 1900
Nashville, TN 37201
615.251.5565 (phone)
615.251.5551 (fax)
lelliot@fbtlaw.com

Alexander S. Czanik *(pro hac vice)*
FROST BROWN TODD LLP
301 East Fourth Street, Suite 3300
Cincinnati, OH 45202
513.651.6800 (phone)
513.651.6981 (fax)
aczanik@fbtlaw.com

*Attorneys for Defendant DuBois Chemicals, Inc.*

# TABLE OF CONTENTS

I.   NATURE AND STAGE OF THE PROCEEDINGS ...................................................................1

II.   SUMMARY OF THE ARGUMENT....................................................................................2

III.  THE COURT SHOULD DISMISS ECOLAB'S CLAIMS THAT DUBOIS DIRECTLY INFRINGED THE '257, '381, AND '215 PATENTS ................................................................................2

    A.  Exemplary Asserted Claims of the Ecolab Patents........................................................3

    B.  Ecolab Failed to Sufficiently Plead Direct Infringement..............................................4

IV.  THE COURT SHOULD GRANT SUMMARY JUDGMENT OF NO INFRINGEMENT OF THE '257, '381, AND '215 PATENTS ................................................................................................6

    A.  Legal Standard ..............................................................................................................6

    B.  Ecolab Provides No Evidence that DuBois Directly Infringes.....................................6

    C.  Ecolab Provides No Evidence that DuBois Indirectly Infringes ...................................7

        1.  Ecolab Provides No Evidence that DuBois Actively Induces Customers ....................7

            a.  There is no evidence of spraying of the Accused Products through a non-energized nozzle in the relevant period ................................................................8

            b.  Evidence of DuBois's conduct shows active discouragement not active encouragement of infringement by its customers ..................................................11

            c.  DuBois cannot be liable for inducement prior to having knowledge of the Asserted Patents ..................................................................................................12

        2.  Ecolab Provides No Evidence that DuBois Contributorily Infringes .........................12

        3.  A Hand Spray Bottle is Not a "Non-Energized Nozzle"; Therefore, It Cannot Infringe the Asserted Claims as a Matter of Law .......................................................14

        4.  Evidence that Does Suggest Direct Application to the Conveyor or Container Is Insufficient to Show Infringements ...........................................................................16

        5.  Ecolab Provides No Evidence that TM Smart Track Sold by DuBois Infringes the Asserted Claims .....................................................................................................17

        6.  Ecolab Provides No Evidence that the Accused Products Contain Less Than About 500 Ppm of Triethanolamine Salts of Alkyl Benzene Sulfonic Acid Compounds as Required by '381 Patent, Claim 1..................................................................................18

V.   THE COURT SHOULD EXCLUDE THE OPINIONS OF MS. MCCLOSKEY UNDER THE DAUBERT STANDARD ...............................................................................................19

    A.  Factual Background .....................................................................................................19

    B.  Ms. McCloskey's Patent Infringement Damages Based on a Hypothetical Negotiation Obviate Ecolab's Ability to Separately Recover Damages for Breach of Contract.........................................................................................................................20

C.  The Court Should Exclude Ms. McCloskey's Opinions Regarding Patent Infringement Damages ........................................................................................23

   1.  Ms. McCloskey Grossly Overstates the Royalty Bases Used in Her Patent Infringement Damages Calculations ..........................................................23

   2.  Ms. McCloskey Improperly Assumes that "Unspecified Noncompliance" Violations Under the Settlement Agreement Are All Patent Infringements ...............25

   3.  Ms. McCloskey Applies Unreliable and Flawed Methodology to her Analytical Approach Analysis ................................................................................27

   4.  Ms. McCloskey Improperly Relies on the Incomparable Ecolab-ICC Settlement of the ICC Action ....................................................................................28

   5.  Ms. McCloskey's Improperly Relies on the Incomparable Thonhauser Distributorship Agreement, Which She Did Not Review ...........................................31

D.  The Court Should Exclude Ms. McCloskey's Opinions Regarding Breach of Contract Damages ...........................................................................................32

   1.  Ms. McCloskey Applies Fundamentally Flawed and Unreliable Methodology in Calculating Expectation Damages for Breach of Contract ..........................32

   2.  McCloskey's Breach of Contract Damages Relating to Spray Bottles Should be Excluded Because the Settlement Agreement Does Not Apply to Spray Bottles .......37

   3.  Ms. McCloskey's Unjust Enrichment Damages for Breach of Contract Should be Excluded, and DuBois is Entitled to Summary Judgment on Ecolab's Unjust Enrichment Claim ........................................................................................40

VI.  CONCLUSION ...........................................................................................................40

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*ACCO Brands, Inc. v. ABA Locks Mfrs. Co.*,
    501 F.3d 1307 (Fed. Cir. 2007) ............................................................................. 7

*Amstar Corp. v. Envirotech Corp.*,
    823 F.2d 1538 (Fed. Cir. 1987) ........................................................................... 18

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986).............................................................................................. 6

*AstraZeneca LP v. Apotex, Inc.*,
    633 F.3d 1042 (Fed. Cir. 2010) ............................................................................. 7

*Bakerman v. Sidney Frank Imp. Co., Inc.*,
    2006 WL 3927242 (Del. Ch. Oct. 10, 2006) ...................................................... 40

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007).............................................................................................. 5

*Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*,
    576 F.3d 1348 (Fed. Cir. 2009) ........................................................................... 25

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986).............................................................................................. 6

*Conformis, Inc. v. Zimmer Biomet Holdings, Inc.*,
    2022 WL 1909386 (D. Del. June 3, 2022)............................................................ 5

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993)............................................................................................ 19

*DSU Med. Corp. v. JMS Co.*,
    471 F.3d 1293 (Fed. Cir. 2006) ............................................................................. 7

*Embrex, Inc. v. Serv. Eng'g Corp.*,
    216 F.3d 1343 (Fed. Cir. 2000) ........................................................................... 24

*Fujitsu Ltd. v. Netgear Inc.*,
    620 F.3d 1321 (Fed. Cir. 2010) ........................................................................... 12

*Global-Tech Appliances, Inc. v. SEB S.A.*,
    563 U.S. 754 (2011).............................................................................................. 8

iii

*IMS Tech., Inc.  v. Hass Automation, Inc.*,
206 F.3d 1422 (Fed. Cir. 2000)...........................................................................6

*In re Bill of Lading Transmission and Processing Sys. Patent Litig.*,
681 F.3d 1323 (Fed. Cir. 2012) ..........................................................................13

*Insituform Tech., Inc. v. Cat Contracting, Inc.*,
161 F.3d 688 (Fed. Cir. 1998) ...........................................................................12

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999)............................................................................................19

*Laser Dynamics, Inc. v. Quanta Computer, Inc.*,
694 F.3d 51 (Fed. Cir. 2012) .............................................................................29

*M2M Sols. LLC v. Enfora, Inc.*,
167 F. Supp. 3d 665 (D. Del. 2016).....................................................................29

*Markman v. Westview Instruments, Inc.*,
52 F.3d 967 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996)) .......................................6

*MAZ Encryption Techs. LLC v. Blackberry Corp.*,
2016 WL 4490706 (D. Del. Aug. 25, 2016) .........................................................30

*Nalco Co. v. Chem-Mod, LLC*,
883 F.3d 1337 (Fed. Cir. 2018) ..........................................................................13

*Niazi Licensing Corp. v. St. Jude Medical S.C., Inc.*,
30 F.4th 1339 (Fed. Cir. 2022) ..........................................................................24

*Pedrick v. Roten*,
70 F.Supp.3d 638 (D. Del. 2014)........................................................................40

*Sanofi v. Lupin Atl. Holdings S.A.*,
282 F. Supp. 3d 818 (D. Del. 2017)..................................................................7, 8

*SmithKline Diagnostics, Inc. v. Helena Lab. Corp.*,
859 F.2d 878 (Fed. Cir. 1988) .............................................................................6

*Sprint Commc'ns Co. LP v. Charter Commc'ns, Inc.*,
No. 2021 WL 982732 (D. Del. Mar. 16, 2021) ...................................27, 28, 29, 30

*Vita–Mix Corp. v. Basic Holding, Inc.*,
581 F.3d 1317 (Fed. Cir. 2009) ..........................................................................13

*W.L. Gore & Assocs. v. Garlock, Inc.*,
   842 F.2d 1275 (Fed. Cir. 1988) .......................................................... 18

*Warner-Lambert Co. v. Teva Pharms. USA, Inc.*,
   418 F.3d 1326 (Fed. Cir. 2005) ........................................................... 7

*Wonderland Switzerland AG v. Evenflo Co., Inc.*,
   564 F. Supp. 3d 320 (D. Del. 2021) ..................................................... 6

*Zimmer Surgical, Inc. v. Stryker Corp.*,
   365 F. Supp. 3d 466 (D. Del. 2019) ................................................... 30

**Statutes**

35 U.S.C. § 271 ............................................................................... 6
35 U.S.C. § 271(c) ........................................................................... 12

**Rules**

Fed. R. Civ. P. 15 ............................................................................ 4
Fed. R. Civ. P. 56(a) ........................................................................ 5

**TABLE OF EXHIBITS**

| Exhibit | Description |
|---|---|
| A | US Patent No. 7,741,257, issued 06/22/2010 (Rothstein Dep. Ex. 394) |
| B | US Patent No. 7,745,381, issued 06/29/2010 (Rothstein Dep. Ex. 395) |
| C | US Patent No. 8,058,215, issued 11/15/2011 (Rothstein Dep. Ex. 396) |
| D | [SEALED] Opening Expert Report of Dr. Jonathan Rothstein, Ph.D. dated January 31, 2023 and Exhibits A-F (excerpted) (Rothstein Dep. Exs. 390, 392, 393, 398, 399, 400, 401) |
| E | [SEALED] Excerpts from the Deposition Transcript of Dr. Rothstein held April 10, 2023 |
| F | [SEALED] Excerpts from the Deposition Transcript of Mr. Rouillard held April 20, 2023 |
| G | [SEALED] Documents produced by Ecolab Inc. and Ecolab USA Inc. ("Ecolab") Bates numbered ECO0005911 & ECO0005913 |
| H | [SEALED] Video produced by Ecolab Bates numbered ECO00017530 |
| I | [SEALED] Video produced by International Chemical Corp. in Ecolab Inc. et al., v. International Chemical Corp., Case No. M.D.Fla. 6:18-Cv-01910-CEM-GJK, Bates numbered ICC 2018 14818 |
| J | [SEALED] Documents produced by Ecolab Bates numbered ECO0017464-65 & ECO0017466-67 |
| K | [SEALED] Excerpts of the Deposition Transcript of Robert Hay held December 1, 2022 |
| L | [SEALED] Excerpts of the Deposition Transcript of Carla Wolowski held January 5, 2023 |
| M | [SEALED] Documents produced by Dubois Chemicals, Inc., ("Dubois") Bates Numbered DCI 0066186-87 (Green Dep. Ex 66), DCI 0000561, DCI 0000568-69, DCI 0036107; and Document produced by ▮▮▮▮▮▮▮▮ Bates numbered ▮▮▮▮00008. |
| N | [SEALED] Document produced by Dubois Bates numbered DCI 0018994 |
| O | [SEALED] Document produced by Dubois Bates numbered DCI 0059429-30 (Catroneo Jr. Ex. 293) |
| P | Documents produced by DuBois Bates numbered DCI 0000096-105, DCI 0000114, DCI 0000124 (Schmipff Dep. Exs. 129, 133, 136, 141, 144, 147, 150) |
| Q | [SEALED] Document produced by DuBois Bates numbered DCI 0085059-60 (Boscher Dep. Ex. 100) |
| R | Documents produced By Dubois Bates numbered DCI 0000001-05 (Boscher Dep. Exs. 110-112, 120) |
| S | [SEALED] Documents produced by Dubois Bates numbered DCI 005841-43, DCI 0008523-26 (Beamer Dep. Ex 28), DCI 0050537-38 |
| T | [SEALED] Excerpts of the Deposition Transcript of Rob J. Justus, Vol II, held December 9, 2022 |

| U | **[SEALED]** Defendant's Second Supplemental Responses to Plaintiffs' First Set of Interrogatories, served April 1, 2022 |
|---|---|
| V | **[SEALED]** Excerpts of the Deposition Transcript of Austin Catroneo held December 6, 2022 |
| W | **[SEALED]** Documents produced by DuBois Bates numbered DCI 0008532-35 & DCI 0008547-50 |
| X | **[SEALED]** Excerpts of the Deposition Transcript of Robert Beamer held August 9, 2022 |
| Y | Declaration of Jacques Rouillard in Support, dated June 8, 2023 |
| Z | Declaration of Matthew Bilski, dated 02/18/2022 |
| AA | **[SEALED]** Documents produced by ZEP Inc. ("ZEP") Bates numbered ZEP000001-26, ZEP000058 |
| BB | **[SEALED]** Document produced by Ecolab Bates numbered ECO0005923-51 |
| CC | **[SEALED]** Expert Report of Frances M. McCloskey, CPA, CFF, MBA, January 31, 2023, and Related Exhibits (McCloskey Dep. Ex. 379) |
| DD | **[SEALED]** Excerpts of the Deposition Transcript of Frances McCloskey held April 4, 2023 |
| EE | **[SEALED]** Excerpts of document produced by DuBois Bates Numbered DCI 0090435 [produced in Native Excel spreadsheet format] |
| FF | **[SEALED]** Document produced by Ecolab Bates numbered ECO0002708-2717 (Green Dep. Ex. 33) |
| GG | **[SEALED]** Reply Expert Report of Frances M. McCloskey, CPA, CFF, MBA, March 24, 2023, and Related Exhibits (McCloskey Dep. Ex. 380) |
| HH | **[SEALED]** Document produced by DuBois Bates numbered DCI 0000763-71 (McCloskey Dep. Ex. 384) |
| II | **[SEALED]** Excerpts of the Deposition Transcript of Rob J. Justus, Vol I, held April 21, 2022 |
| JJ | **[SEALED]** Document produced by DuBois Bates numbered DCI 00000439-41 (Boscher Dep. Ex. 102) |

## I.   NATURE AND STAGE OF THE PROCEEDINGS

In this action, Plaintiffs Ecolab Inc. and Ecolab USA, Inc (collectively and individually, "Ecolab") allege that Defendant DuBois Chemicals, Inc. ("DuBois") infringes U.S. Patent Nos. 7,741,257 ("the '257 Patent"), 7,745,381 "(the '381 Patent") and U.S. Patent 8,058,215 ("the '215 Patent") (collectively, the "Asserted Patents") by making, using, offering to sell, and selling DryTrac, TM Smart Track, and Super Loob OF dry lubricants (collectively, the "Accused Products"), and inducing and contributing to the direct infringement by third parties using these products.  (*See generally* D.I. 1, Complaint filed 4/3/2021.)  Ecolab filed a Motion for Leave to Amend on October 14, 2022 (D.I. 107), which was denied by the Court on January 10, 2023.  (D.I. 151.)  The parties completed expert discovery by April 20, 2023.  This case is scheduled for trial beginning October 30, 2023.  (D.I. 14.)

In the Complaint, Ecolab claimed that "Ecolab personnel has observed DuBois dry lubricants being applied in a manner that violates the Settlement Agreement and infringes Ecolab's patents."  (D.I. 1 at ¶20.)  Ecolab also alleged that DuBois continued to provide "the Accused Lubricants to customers it *knows* are infringing" each of the Asserted Patents and that "DuBois *knows* that its customers use the Accused Lubricants in a manner that infringers."  (*Id.* at ¶¶ 33-34, 36-37, 50-51, 53-54, 68-69, 71-72 (emphasis added).)  Ecolab further alleged that such actions "demonstrate[] that DuBois has *intended to induce* its customers to infringe."  (*Id.* at ¶¶36, 53, 71 (emphasis added).)  In addition, Ecolab alleged that DuBois' infringement of the Asserted Patents is and has been willful and intentional.  (*Id.* at ¶¶40, 57, 75.)

Ecolab further alleged that DuBois has breached the Settlement Agreement, by failing to timely complete certain required actions, by failing to complete other required steps, and by continuing to provide dry lubricant to its customers who were applying the lubricant using a prohibited method.  (*See, e.g.,* D.I. 1 at ¶79.)

## II.    SUMMARY OF THE ARGUMENT

DuBois respectfully brings a motion to dismiss under Fed. R. Civ. P. 12(c), motions for summary judgment under Fed. R. Civ. P. 56, and a *Daubert* motion to exclude unreliable opinions offered by Ms. Frances McCloskey.

*First*, DuBois moves to dismiss Ecolab's claim of direct infringement by DuBois as being insufficiently pled.  The Complaint repeatedly states that DuBois's customers, namely the bottling facilities, directly infringe, but is silent as to DuBois directly infringing. (*Infra* Section III.B.)

*Second*, DuBois moves for summary judgment of no direct infringement by DuBois. Ecolab provides no evidence that DuBois, itself, directly infringes as DuBois is not applying dry lubricant through non-energized nozzle(s) directly to a conveyor.  (*Infra* Section IV.B.)  DuBois moves for summary judgment of no indirect infringement as DuBois does not actively induce or is willfully blind, but instead actively discourages any infringement (*infra* Section IV.C.1) and the Accused Products have substantial non-infringing uses (*infra* Section IV.C.2).  Additionally, Ecolab provides no evidence that (i) a hand spray bottle is a non-energized nozzle(s) as required, (ii) TM Smart Track sold by DuBois has ever been applied through non-energized nozzle(s), or (iii) the Accused Products meet the claim limitation of less than 500 ppm of TEA ABSA, for which Ecolab performed no testing whatsoever.  (*Infra* Sections IV.C.3-IV.C.6.)

*Third*, DuBois moves to exclude Ms. McCloskey's opinions regarding patent infringement damages based on a hypothetical negotiation that obviates Ecolab's ability to separately recover damages for breach of contract.  (*Infra* Section V.B.)  DuBois moves to exclude Ms. McCloskey's opinions because she grossly overstates the royalty base by failing to apportion DuBois' allegedly infringing sales and instead captures 100 percent of DuBois' sales, assumes unspecified non-compliance violations of the Settlement Agreement are somehow patent infringements despite clear evidence to the contrary, applies an analytical approach that compared DuBois' profit margin

on DryTrac to DuBois' profit margin on its full line of Food and Beverage products, relies on an incomparable Ecolab-ICC Settlement Agreement which is disapproved by this Court, and relies on a Thonhauser Distributorship Agreement, that she admittedly failed to review, as an alleged comparable patent license agreement.

*Finally*, DuBois moves to exclude Ms. McCloskey's opinions regarding breach of contract damages as they apply fundamentally flawed and unreliable methodologies in calculating expectation damages, include damages attributable to inapplicable spray bottles, and raise an unpled unjust enrichment theory despite the presence of a contract. (*Infra* Section IV.D.1.)  DuBois moves for summary judgment on Ecolab's unjust enrichment claim.  The Court should therefore exclude Ms. McCloskey's opinions for patent infringement and breach of contract damages.

## III. THE COURT SHOULD DISMISS ECOLAB'S CLAIMS THAT DUBOIS DIRECTLY INFRINGED THE '257, '381, AND '215 PATENTS

### A. Exemplary Asserted Claims of the Ecolab Patents

As shown in part below, the three asserted independent claims (claim 41 of the '257 Patent, claim 1 of the '381 Patent, and claim 1 of the '215 Patent) are each directed to a method for lubricating the passage of a container/package by applying a lubricant composition through non-energized nozzle(s) directly to a conveyor.

| '257 Patent, Claim 41 | '381 Patent, Claim 1 | '215 Patent, Claim 1 |
|---|---|---|
| A **method** for lubricating the passage of a container along a conveyor comprising | A **method** for lubricating the passage of a container along a conveyor comprising | A **method** for lubricating the passage of a container or package along a conveyor comprising: |
| **applying** an undiluted lubricant composition | **applying** a lubricant composition | **spray-applying** a water contain-ing lubricant composition [...] |
| **through non-energized nozzles** | **through non-energized nozzles** | **through a non-energized nozzle** |
| **to** at least a portion of the containers contacting | **to** at least a portion of the container-contacting surface | **to** at least a portion of a container-contacting or package- |

| surface of the conveyor or at least a portion of the conveyor-contacting surface of the containers [...] | of the conveyor or at least a portion of the conveyor-contacting surface of the container [...] | contacting surface of the conveyor or at least a portion of a conveyor-contacting surface of the container or package [...] |
|---|---|---|
| wherein the lubricant composition is applied for a period of time and not applied for a period of time and the ratio of applied:not applied time is at least 1:10. [(Ex. A[1], '257 Patent, claim 41, 14:5-15.)] | wherein the lubricant composition contains less than about 500 ppm of triethanolamine salts of alkyl benzene sulfonic acid compounds. [(Ex. B, '381 Patent, claim 1, 20:12-20.)] | wherein the lubricant composition is not further diluted with water upon application, is applied for a period of time and not applied for a period of time, and the ratio of applied:not applied time is at least 1:10. [(Ex. C, '215 Patent, claim 1, 11:15-27.)] |

Through its technical expert, Dr. Jonathan Rothstein, Ecolab alleges that "[a]utomated nozzles, spray bottle nozzles, and pin spray nozzles are all non-energized nozzles because they do not require pressure greater than 80 psi, compressed air, or sonication." (Ex. D, Rothstein Rpt. at Exhibits B-D.) According to Dr. Rothstein, the automated nozzles at issue are computer-controlled nozzles used to apply lubricant to a moving conveyor belt at an application station programmed to control timing, pressure, and operation. (Ex. E, Rothstein Dep. at 120:13-21.) Dr. Rothstein further describes the "spray bottles" at issue as common "squirt bottle[s]" or "hand spray[s]". (*Id.* at 79:11-80:1; 108:17-18; 122:3-13; 131:14-132:6.) Finally, Dr. Rothstein describes the "pin spray nozzles" at issue as nozzles at brush stations that are missing the bristles, thus exposing the orifice plate and yielding a "pin spray". (*Id.* at 79:22-24; 96:7-11; 108:19-21; 110:14-22.) These impromptu nozzles are allegedly the result of broken brushes. (*Id.* 86:20-24; 110:14-17.)

### B.    Ecolab Failed to Sufficiently Plead Direct Infringement

Pursuant to Fed. R. Civ. P. 12(c), DuBois respectfully requests that the Court dismiss Ecolab's claim of direct infringement by DuBois. Ecolab's Complaint (D.I. 1) recites only "bare, conclusory allegations [that] are no more than a 'formulaic recitation of the elements of a cause of

---

[1] Unless otherwise noted, all citations to Exhibits are to the accompanying Declaration of James M. Lennon, filed herewith.

action' and are therefore inadequate to survive a motion to dismiss." *Conformis, Inc. v. Zimmer Biomet Holdings, Inc.*, No. CV 19-1528-RGA, 2022 WL 1909386, at *4 (D. Del. June 3, 2022) (Andrews, J) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).) As in *Conformis*, "[n]owhere does [Plaintiff] specifically allege infringing activity by [Defendant] taking place in the United States, as required by § 271(a)." *Id*.

Each asserted claim is directed to a method of use, specifically "applying" or "spray-applying." In the Complaint, Ecolab failed to plead facts to indicate that DuBois, itself, engaged in either of these. Instead, like in *Conformis*, the Complaint merely states "DuBois has infringed one or more of the claims of the [of the Asserted Patents] by making, using, selling, and/or offering for sale" a product, the use of which is alleged to infringe. (D.I. 1 at ¶¶25, 43, 60.) While the Complaint alleges that "DuBois sets up the application equipment at its customers' facilities," Ecolab has not alleged (nor could it) that DuBois, itself, applies or spray-applies any of the Accused Products. Nor should an allegedly infringing act be inferred based on these allegations. Instead, the Complaint repeatedly makes clear that "**DuBois's customers**—namely, the bottling facilities that purchase [the Accused Lubricants]—**directly infringe**." (*See* D.I. 1 at ¶¶34, 37, 51, 54, 69, 72 (emphasis added).) Ecolab asks that the Court read between the lines of its allegations regarding DuBois' conduct to find an implicit allegation of direct infringement.

As this Court explained in *Conformis*, "[w]hile the standard for evaluating a plaintiff's allegations on a motion to dismiss requires accepting all of plaintiff's factual allegations as true and viewing them in the light most favorable to the plaintiff, it does not require a court to reach beyond what is actually alleged." *Conformis*, 2022 WL 1909386 at *9 (refusing to infer an allegation of importation based merely on an allegation of sales from an international entity and a

U.S. entity).  Because Ecolab has failed to specifically allege any infringing activity by DuBois, Ecolab's claim of direct infringement by DuBois should be dismissed.

## IV.    THE COURT SHOULD GRANT SUMMARY JUDGMENT OF NO INFRINGEMENT OF THE '257, '381, AND '215 PATENTS

### A.    Legal Standard

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law,"  Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), or where "there is an absence of evidence to support the nonmoving party's case,"  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986), such that "no reasonable jury could find" in favor of the party opposing the motion, *IMS Tech., Inc.   v. Hass Automation, Inc.*, 206 F.3d 1422, 1429 (Fed. Cir. 2000).

"The patent owner has the burden of proving infringement and must meet its burden by a preponderance of the evidence."  *Wonderland Switzerland AG v. Evenflo Co., Inc.*, 564 F. Supp. 3d 320, 324 (D. Del. 2021) (Andrews, J.) (citing *SmithKline Diagnostics, Inc. v. Helena Lab. Corp.*, 859 F.2d 878, 889 (Fed. Cir. 1988)).   "A two-step analysis is employed in making an infringement determination."  *Id.* (citing *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370, (1996)).  First, the court must construe the asserted claims to ascertain their meaning and scope.  The trier of fact must then compare the properly construed claims with the accused infringing product.  This second step is a question of fact.

### B.    Ecolab Provides No Evidence that DuBois Directly Infringes

Each of the asserted independent method claims requires that a dry lubricant composition be "applied" or "spray-applied" as an element of those claims.  Ecolab has provided no evidence that DuBois, itself, applies or spray-applies any of the Accused Products.  Instead, Ecolab has always contended that "DuBois's customers—namely, the bottling facilities . . . directly infringe."

(*See* D.I. 1, at ¶¶34, 37, 51, 54, 69, 72.)  Moreover, Ecolab's infringement expert, Dr. Rothstein, cites no specific evidence that DuBois itself, applies or spray-applies any of the Accused Products. Accordingly, because Ecolab cannot establish a necessary element of each of the asserted claims, DuBois is entitled to summary judgment of no direct infringement.

### C.    Ecolab Provides No Evidence that DuBois Indirectly Infringes

#### 1.    Ecolab Provides No Evidence that DuBois Actively Induces Customers

Ecolab alleges induced infringement.    (D.I. 1 ¶¶35-39, 52-56, 70-74.)    Induced infringement is a question of fact, *AstraZeneca LP v. Apotex, Inc.*, 633 F.3d 1042, 1056 (Fed. Cir. 2010), that must be proven by a preponderance of the evidence, *Warner-Lambert Co. v. Teva Pharms. USA, Inc.*, 418 F.3d 1326, 1341 n.15 (Fed. Cir. 2005).

"In order to prevail on an inducement claim, the patentee must establish first that there has been direct infringement, and second that the alleged infringer knowingly induced infringement and possessed specific intent to encourage another's infringement." *Sanofi v. Lupin Atl. Holdings S.A.*, 282 F. Supp. 3d 818, 826 (D. Del. 2017) (Andrews, J.) (citing *ACCO Brands, Inc. v. ABA Locks Mfrs. Co.*, 501 F.3d 1307, 1312 (Fed. Cir. 2007)).    In other words, "inducement requires evidence of culpable conduct, directed to encouraging another's infringement, not merely that the inducer had knowledge of the direct infringer's activities." *Id.* (citing *DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1306 (Fed. Cir. 2006) (en banc)).    "[M]ere knowledge of possible infringement by others does not amount to inducement; specific intent and action to induce infringement must be proven." *Warner-Lambert*, 316 F.3d at 1364.    The "knowledge" requirement of induced infringement may be satisfied through "the doctrine of willful blindness" which includes two basic requirements:

(1) the defendant must subjectively believe that there is a high probability that a fact exists and (2) the defendant must take deliberate actions to avoid learning of

that fact. We think these requirements give willful blindness an appropriately limited scope that surpasses recklessness and negligence. Under this formulation, a willfully blind defendant is one who takes deliberate actions to avoid confirming a high probability of wrongdoing and who can almost be said to have actually known the critical facts.

*Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769 (2011). "In contrast to direct infringement, liability for inducing infringement attaches only if the defendant knew of the patent and that the induced acts constitute patent infringement." *Sanofi*, 875 F.3d at 643 (internal quotations and citation omitted).

### a.    *There is no evidence of spraying of the Accused Products through a non-energized nozzle in the relevant period*

As noted above, Ecolab alleges DuBois induces infringement by encouraging its customers to apply infringing dry lubricant through non-energized nozzles. As explained more fully below, DuBois can only have liability for inducement at such time as it became aware of the Asserted Patents, *i.e.*, no earlier than the summer of 2019. (*Infra* Section IV.C.1.c.) Ecolab alleges three types of devices are used as a "non-energized nozzle": (1) an "automated nozzle"; (2) a hand "spray bottle"; and (3) a "pin spray nozzle". As explained more fully below, a hand spray (or "squirt") bottle requires a trigger squeeze to transfer mechanical energy to compress fluid (and initially air) to generate a spray. (*Infra* Section C.3.) Thus, a hand spray bottle cannot be considered a non-energized nozzle. Likewise, the allegedly infringing "pin sprays" result from brushes missing brittles, i.e., broken brushes. There is no evidence of record from which one could logically infer that DuBois encouraged the use of broken brushes to apply the Accused Products. This leaves only automated nozzles. Again, there is no evidence of record to suggest that DuBois encouraged the use of an automated nozzle to apply the Accused Products.

In discovery, Ecolab initially identified thirteen plants where "Plaintiffs . . . personnel have witnessed post-Settlement Agreement application of the Accused Products at various plants in a

manner that violates the parties' Settlement Agreement and/or infringes the Asserted Patents."

Two of these thirteen instances were later recanted by Ecolab resulting in eleven instances.[2]  Only

three[3] of these original thirteen instances even allege application through spray nozzles in the U.S.

These three instances allegedly constitute the best evidence Ecolab has put forward in the record

to show direct infringement by anyone, which as noted, is a prerequisite to inducement.  However,

none of these alleged instances suffice to demonstrate infringement, as each fails to actually show

applying or spray-applying of the Accused Products through non-energized nozzles.

The only photographic evidence in the record of alleged infringement by actually applying

or spray-applying is Ex. G, ECO0005911 and ECO0005913.  However, there is no evidence that

this observed application is a DuBois lubricant, or that it was an infringing "**dry**" lubricant, *i.e.*,

not a non-infringing "**wet**" lubricant.  Similarly, the two videos relied upon by Dr. Rothstein to

show infringement are both irrelevant to the infringement claims in this action.  (Ex. H,

ECO0017530; Ex. I, ICC 2018 14818.)  Both videos pre-date DuBois' acquisition of certain assets

of ICC on October 25, 2019, and pertain to ICC, not DuBois.  Ecolab's lack of infringement

evidence is despite the fact that Ecolab conducted mandatory employee training sessions regarding

the "ICC/DuBois Settlement" on June 9-10, 2020, (Ex. J, ECO0017464 and ECO0017466), during

which Ecolab account managers were instructed to look for violations of the settlement agreement

---

[2] ███████████████████████████ was removed in the Plaintiffs' First Supplemental
Responses and Objections to Defendant's Interrogatory 7, and ███████████████
██████ was removed in the Plaintiffs' Third Supplemental Responses and Objections to
Defendant's Interrogatory 7.  Regarding the alleged ███████████████████████████
violation, Counsel for Ecolab admitted "Mr. Hay explains that -- an instance that Ecolab had
asserted as infringing was -- there was miscommunication, it was a wet lube being used." (Ex. F,
Rouillard Dep. at 219:8-13.)
[3] ███████████████

and/or infringements by DuBois customers, to take photos of their observations without telling the customer, and to report their findings to Ecolab's counsel.  (Ex. K, Hay Dep. at 214:12-225:5.)

Dr. Rothstein further alleges that filling spray bottles with dry lubricant shows an affirmative intent that direct infringement be carried out.  This is incorrect.  First, as noted below, applying through a spray bottle is not applying through a "non-energized nozzle".  (*Infra* Section IV.C.3.)  Second, there is no evidence in the record showing application of dry lubricant using a spray bottle directly to the conveyor (an alleged infringing act), as opposed to spraying on a cloth and then wiping onto a conveyor (an admittedly non-infringing act).  (Ex. E, Rothstein Dep. at 81:23-82:18; see also 82:19-83:3.)

Despite Ecolab's issuance of sixteen subpoenas, Ecolab chose to depose only a <u>single</u> DuBois customer (███████████████████████.  Even in this lone instance of discovery taken from an alleged direct infringer, the evidence fails to demonstrate any instance of infringement.  According to the deposition testimony of ███████████, the Sanitation Manager of ███████████████████ never applied the Accused Products in an infringing manner and there were no sprayers or spray nozzles on the system that DuBois installed.  (Ex. L, Wolowski Dep. at 130:7-15; 134:12-15; 144:12-16, *see also* 147:8-12.)  As Ms. █████████ explained: "[t]here are no spray nozzles on the entire applicator system.  They're all brushes."  (*Id.* at 107:21-22.)  Specifically, Ms. ████████ testified: "we were not and had not ever been spraying DryTrac RTU onto our conveyors."  (*Id.* at 127:1-3.)  █████████ does use spray nozzles to apply the wet lubricant FT100, which is not at issue in this case.  (*Id.* at 144:20-145:20.)  As admitted by Dr. Rothstein, infringement only exists where the lubricant is a "***dry***" lubricant rather than a "***wet***" lubricant.  (Ex. E, Rothstein Dep. at 124:22-125:10; *see also* Ex. D, Rothstein Rpt. at ¶53.) In sum,

the evidence of record is insufficient to demonstrate that the Accused Products are or were applied directly to a conveyor through a non-energized nozzle.

### b. Evidence of DuBois's conduct shows active discouragement, not active encouragement, of infringement by its customers

The evidence of record does not support the allegation that DuBois is actively inducing its customers to apply the Accused Products directly to a conveyor through a non-energized nozzle. No reasonable juror would find DuBois' conduct to be an active encouragement to directly apply the Accused Products using a non-energized nozzle (requisite for infringement) instead of through a brush or cloth (admittedly non-infringing alternatives). In fact, the record is replete with evidence to the contrary, showing that DuBois has instructed, and continues to instruct, its customers to apply the lubricant through installed brushes, not nozzles, and that DuBois actively discourages the application of the Accused Products directly to a conveyor through a non-energized nozzle.

DuBois repeatedly instructed its customers and distributors to use the Accused Products in a manner that Ecolab admits is non-infringing. For example, DuBois sent a number of letters to customers explaining how the Accused Products should be applied. (Ex. M, Green Dep. Ex. 66, see also DCI 0000561, DCI 0000568-69, DCI 0036107, ████_00008.) Even Dr. Rothstein acknowledges, "I know that they wrote a lot of letters and published and sent lots of papers out." (Ex. E, Rothstein Dep. at 129:6-7.) DuBois' has also updated its website (Ex. N, DCI 0018994), YouTube channels (Ex. O, Catroneo Jr. Dep. Ex. 293), product information sheets (Ex. P, Schimpff Dep. Exs. 129, 133, 136, 141, 144, 147, 150; Boscher Dep. Ex. 100), and case studies (Ex. R, Boscher Dep. Exs. 110-112, 120) as to the application of its Dry Lubricant products.

Nor is the evidence of record sufficient to establish that DuBois possessed specific intent to encourage infringement. DuBois regularly visited its customers and remedied any instances

where the Accused Products were being applied contrary to DuBois' express instructions (*See, e.g.*, Ex. S, DCI 0005841-5843, DCI 0008523-26, DCI 0050537; Ex. T, Justus Dep. Vol. II at 229:11-22.)   In sum, the evidence of record is insufficient to demonstrate that DuBois actively encouraged any of the alleged acts of direct infringement.

### c.   DuBois cannot be liable for inducement prior to having knowledge of the Asserted Patents

Finally, as noted above, there can be no inducement prior to DuBois having knowledge of the Asserted Patents. *Insituform Tech., Inc. v. Cat Contracting, Inc.*, 161 F.3d 688, 695 (Fed. Cir. 1998) (reversing a finding of liability for inducing infringement because liability could not be predicated on any acts that occurred before defendant corporation had notice of the patent.). Ecolab alleges in the Complaint that "DuBois has been aware of the [Asserted Patents] since at least October 26, 2019, when it purchased ICC."   (D.I. 1 at ¶¶33, 50, 68.)   DuBois has acknowledged that it first became aware of the Asserted Patents in the summer of 2019 while conducting due diligence related to its acquisition of certain assets of ICC.   (Ex. U, Def's Second Supp. Resp. to First Set of Interrog. 4, served 4/1/2022, at 9.)   There is no record evidence of any knowledge, or attempt to avoid knowing, of the Asserted Patents by DuBois prior to the summer of 2019.   In sum, there can be no liability for inducement prior to June 1, 2019.

### 2.   Ecolab Provides No Evidence that DuBois Contributorily Infringes

Ecolab has failed to show that DuBois contributorily infringed any claim of the Asserted Patents under 35 U.S.C. § 271(c).   To establish contributory infringement, the patent owner must show the following elements: "1) that there is direct infringement, 2) that the accused infringer had knowledge of the patent, 3) that the component has no substantial noninfringing uses, and 4) that the component is a material part of the invention." *Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321, 1326 (Fed. Cir. 2010).   "A substantial noninfringing use is any use that is 'not unusual, far-fetched,

illusory, impractical, occasional, aberrant, or experimental.'" *Nalco Co. v. Chem-Mod, LLC*, 883 F.3d 1337, 1357 (Fed. Cir. 2018) (citing *Vita–Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317, 1327 (Fed. Cir. 2009).)   "For purposes of contributory infringement, the inquiry focuses on whether the accused products can be used for purposes *other than* infringement." *Id.* (*citing In re Bill of Lading Transmission and Processing Sys. Patent Litig.*, 681 F.3d 1323, 1338 (Fed. Cir. 2012)(emphasis in original).)

The Complaint alleges "DuBois has also contributed to the infringement of the [Asserted Patents] by selling and offering for sale the Accused Lubricants."  There is no dispute that DuBois' encouragement of its customers to apply the Accused Products using brushes instead of non-energized nozzles is a substantial non-infringing use.  Moreover, the reports of Ecolab's technical and damages experts were silent on the question of contributory infringement.  In fact, Dr. Rothstein expressly acknowledges that he did not render an opinion on contributory infringement. (Ex. E, Rothstein Dep. at 46:8-47:9.)  Dr. Rothstein also admits that all of the asserted claims require direct application from a non-energized nozzle to the conveyor belt or container, which excludes wiping on the conveyor using a cloth.  (*Infra* Section IV.C.4.)  Finally, the Accused Products may be applied to surfaces other than conveyors including worm gears (Ex. V, A. Catroneo Dep. at 74:8-16), airveyors (Ex. W, DCI0008532-35; DCI0008547-50), guide rails or within machines (*see* Ex. X, Beamer Dep. at 199:16-202:22; 320:17-322:12).  All of the foregoing constitute substantial non-infringing uses of the Accused Products.

In sum, the evidence of record is insufficient as a matter of law to establish that DuBois contributes to any alleged direct infringer's infringement.

### 3. A Hand Spray Bottle is Not a "Non-Energized Nozzle"; Therefore, It Cannot Infringe the Asserted Claims as a Matter of Law

A hand spray bottle cannot be a non-energized nozzle or non-energized nozzles. The Court construed the term "non-energized nozzle" to mean, "a nozzle that does not require pressure greater than 80 psi, compressed air, or sonication." (D.I. 86 at 1.) Prior to the time of claim construction, Ecolab had not alleged that a hand spray bottle ("squirt bottle") was within the scope of a "non-energized nozzle." (*See generally*, D.I. 1.) After the close of fact discovery, through its expert disclosures, Ecolab first alleged that "[a]utomated nozzles, spray bottle nozzles, and pin spray nozzles are all non-energized nozzles because they do not require pressure greater than 80 psi, compressed air, or sonication." (Ex. D, Rothstein Rpt, Exhibits B-D.) Notably, Ecolab conceded in its original proposal for the construction of "non-energized nozzle" that such a nozzle "does not require **applied energy**." (D.I. 68 at 14 (22 of 74); *see also, id.* at 16 ("[a] 'non-energized nozzle,' by contrast, is one that **does not use energy**"); *id.* at 3 (13 of 74) (*quoting* Ecolab's prosecution arguments at D.I. 42-1, (ECO0000924) ("Applicants have incorporated the element of non-energized nozzles into all of the independent claims in order to advance prosecution … While non-energized nozzles are standard spray equipment, **it was not known, prior to Applicants invention, how to dispense undiluted lubricant compositions through non-energized nozzles**.").)

First, a spray bottle requires applied energy (*e.g.*, mechanical energy). (Ex. Y, Rouillard Dec., ¶8.) Through manually squeezing the trigger of the spray bottle, a user applies mechanical energy to initiate the flow of fluid through a spray nozzle. (*Id.* at ¶9.) In fact, the initial squeezing even compresses air sucked up the bottle tube while in the chamber adjacent to the nozzle of the spray bottle. (*Id.* at ¶10.) In this way, manual spray bottles use compressed air to prime the spray bottle for use. (*Id.* at ¶11.) Thus, a spray bottle not only requires applied energy, but also requires

14

the compression of air, to achieve a spray. (*Id.* at ¶12.) For this reason, a spray bottle cannot infringe the Asserted Patents.

Second, regarding the asserted claims of the '257 and '215 Patents, a handheld spray bottle does not involve "feeding lubricant into *application system*" which is necessary for the claim construction of "undiluted".[4] Particularly, independent claim 41 of the '257 Patent expressly recites "undiluted". Similarly, independent claim 1 of the '215 Patent recites "not further diluted," which Ecolab asserts means "undiluted" as construed by the Court. (Ex. D, Rothstein Rpt, Exhibits B-D.) Matthew Bilski, Lead Chemist for Ecolab's Food and Beverage division, stated "[a] conveyor lubricant *application system* in a single plant can include hundreds of individual nozzles or other application mechanisms." (Ex. Z, Bilski Declaration, D.I. 69 at 26.) Therefore, because a handheld spray bottle does not involve feeding lubricant into an application system, no asserted claim of the '257 or '215 Patents can be infringed by a spray bottle.

Third, use of a handheld spray bottle would not be associated with a specified "applied time". Specifically, independent claim 41 of the '257 Patent and independent claim 1 of the '215 Patent each require "applied for a period of time and not applied for a period of time and the ratio of applied:not applied time is at least 1:10." A handheld manually actuated spray bottle provides only an intermittent spray between squeezes, not a continuous spray during an "applied time". For at least this additional reason, a handheld manually actuated spray bottle cannot infringe the claims of the '257 or '215 Patents.

Lastly, regarding the '257 and '381 Patents, no reasonable juror would find that a spray bottle has two or more "non-energized nozzles". Unlike claim 1 of the '215 Patent which requires

---

[4] In the Joint Claim Construction Brief, Ecolab and DuBois agreed that undiluted means not diluted with water after being fed into the application system. (D.I. 68 at 13, 64.)

"**a** non-energized nozzle", claim 41 of the '257 Patent and claim 1 of the '381 Patent require "non-energized nozzle**s**", which a spray bottle does not have.  The Court should reject Ecolab's belated attempt to skirt the Court's claim construction by alleging that "non-energized nozzles" include a handheld manually actuated spray bottle.  DuBois respectfully requests that the Court grant summary judgment of no infringement with respect to Ecolab's allegations regarding spray bottles.

### 4. Evidence that Does Not Suggest Direct Application to the Conveyor (or Container) Is Insufficient to Show Infringement

To infringe any claim of the Asserted Patents, the Accused Product must be applied <u>directly</u> to the conveyor or container/package.  Specifically, the Accused Product must be applied to at least a portion of a container-contacting surface (or package-contacting surface of the conveyor) or at least a portion of a conveyor-contacting surface of the container or package.  Ecolab alleges that (1) spraying the Accused Product from a handheld spray bottle directly onto a conveyor, and then (2) manually wiping the lubricant across the conveyor surface using a rag or cloth constitutes an infringement.  However, Ecolab concedes that (1) spraying the Accused Product from the handheld spray bottle onto the rag or cloth, and then (2) wiping the lubricant onto the conveyor using the rag or cloth is not an infringement.  (Ex. E, Rothstein Dep. at 82:21-83:3.)  According to Dr. Rothstein, "applying the dry lubricant to a cloth does not infringe upon the patents."  (*Id.* at 81:18-22.)  Dr. Rothstein further clarified, that for any of the asserted method claims to be infringed, a spray of the accused lubricant "go[es] directly to the conveyor belt," or onto a container traversing the conveyor, but infringement does not occur when lubricant is applied to the conveyor "through an intermediary, like a cloth or a brush."  (*Id.* at 81:23-82:18; *see also* 82:19-83:3.)  Even if the Court were to determine that a spray bottle could be within the scope of the Asserted Patents, DuBois respectfully requests that the Court grant summary judgment of no induced infringement

where Ecolab relies only on its supposition that the contents of spray bottles containing the Accused Products were applied directly onto a conveyor rather than through an intermediary.

Ecolab further alleges that pin sprays spewing from broken brush stations constitute application of the Accused Products through a non-energized nozzle. But there is no evidence of record to suggest that DuBois intentionally breaks these brushes or encourages or otherwise induces a customer to do so. DuBois respectfully requests that the Court grant summary judgment of no induced infringement with respect to Ecolab's allegations regarding pin spray from broken brush stations.

### 5. Ecolab Provides No Evidence that TM Smart Track Sold by DuBois Infringes the Asserted Claims

Ecolab, including Dr. Rothstein, has not cited a single specific instance where TM Smart Track sold by DuBois is applied through a non-energized nozzle.[5] (*See* Ex. E, Rothstein Dep. at 80:6-25.) Instead, TM Smart Track sold by DuBois is applied with brushes. (Ex. P, Schimpff Dep. Ex. 150.) A Thonhauser product sheet, cited by Dr. Rothstein as alleged support in Exhibits B-D of his Report, states "[s]pecial brushes continuously apply a very small, defined quantity of TM SMART TRACK to each chain, taking care of [a] uniform distribution" and "prevent[] any kind of aerosols." (*Id.*) TM Smart Track sold by DuBois uses "[t]echnically advanced control elements and valves allow a very flexible and individual fine-tuning - especially in critical sections." ███████████████████████████████████████████

███████████████████████████████████████████████ (Ex. BB,

---

[5] ████████████████████████████████████████████████████████

███████████████████

ECO0005923-951.)  In view of the foregoing, DuBois respectfully requests that the Court grant summary judgment of no infringement with respect to TM Smart Track sold by DuBois.

> **6.    Ecolab Provides No Evidence that the Accused Products Contain Less Than About 500 ppm of Triethanolamine Salts of Alkyl Benzene Sulfonic Acid Compounds as Required by '381 Patent, Claim 1**

"Where the evidence of infringement consists merely of one expert's opinion, without supporting tests or data, the district court is under no obligation to accept it. *W.L. Gore & Assocs. v. Garlock, Inc.*, 842 F.2d 1275, 1280 (Fed. Cir. 1988) (*citing Amstar Corp. v. Envirotech Corp.*, 823 F.2d 1538, 1545, 3 USPQ2d 1412, 1417 (Fed. Cir. 1987).)  As quoted above, claim 1 of the '381 Patent requires that the "*the lubricant composition contains less than about 500 ppm of triethanolamine salts of alkyl benzene sulfonic acid compounds.*" (*Supra* at 2-3 (*citing* Ex. B, '381 Patent, claim 1, 20:12-20.).)  These compounds, sometimes referred to as TEA ABSA acids are described in the '381 Patent as "common emulsifiers which provide excellent emulsion stability, resistance to creaming, and freeze-thaw stability in silicone emulsions." (*Id.* at 6:6-8.)  Dr. Rothstein acknowledges that one of the ways the '381 Patent was allowed over the prior art was to say that it specifically excluded TEA ABSA, at least at concentrations above 500 parts per million. (Ex. E, Rothstein Dep. at 170:7-14.)  The evidence of infringement with respect to TEA ABSA consists merely of Dr. Rothstein's opinion, without supporting tests or data.  In fact, Dr. Rothstein admitted that he never performed, requested, or reviewed any chemical tests, let alone a test to assess the presence of this common emulsifier, TEA ABSA, in the Accused Products, which were known to contain an emulsifier with 50-60% unidentified ingredients. (Ex. E, Rothstein Dep. at 157:15-158:6; 169:15-17.)  The only evidence Dr. Rothstein cites to support his opinion regarding TEA ABSA acids is the deposition testimony of David Schimpff, DuBois' Vice President of R&D. (Ex. D, Rothstein Rpt., Exhibits B-D.)  During Dr. Rothstein's deposition, he was made aware that Mr. Schimpff only testified as to specific ingredients on the ingredient lists

18

for the Accused Products and that Mr. Schimpff testified that he did not know whether TEA ABSA was absent from the ingredients on that list, including the listed emulsifiers, such as H-SIL EM 1060. (Ex. E, Rothstein Dep. at 153:2-155:8.) In response, Dr. Rothstein testified that the only other bases he had to opine on the presence of TEA ABSA were datasheets for the ingredients. (*Id.* at 169:18-25.) When confronted with the fact that the datasheet in question recited the presence of other [unlisted] components below reportable levels, which made up 50-60% of the emulsifier, Dr. Rothstein admitted that could not tell from the datasheet whether or not TEA ABSA was present. (*Id.* at 156:2-161:13.) Accordingly, DuBois is entitled to summary judgment of no direct or indirect infringement of the '381 Patent.

## V.     THE COURT SHOULD EXCLUDE THE OPINIONS OF MS. MCCLOSKEY UNDER THE DAUBERT STANDARD

DuBois respectfully moves the Court to exclude the testimony of Ecolab's financial expert, Frances McCloskey pursuant to Fed. R. Evid. 702 under the standard of *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592-93 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999)."

### A.     Factual Background

On October 25, 2019, DuBois acquired certain assets belonging to International Chemical Corporation ("ICC"). (*See, e.g.* Ex. CC, McCloskey Rpt. at 6.) Those assets are generally related to ICC's conveyor lubricant business, and specifically included ICC's dry lubricant product, DryTrac. At the time of DuBois' acquisition, Ecolab and ICC were involved in a lawsuit in the U.S. District Court for the Middle District of Florida styled *Ecolab Inc. and Ecolab USA Inc. v. International Chemical Corporation*, Case No. 6:18-cv-01910-CEM-GJK (the "ICC Action"). (*See* D.I. 1-1, Settlement Agreement, at 2-11.) On January 14, 2020, Ecolab sought to add DuBois as a party to the ICC Action pursuant to Federal Rule of Civil Procedure 25(c). (*Id.*)

On March 24, 2020, Ecolab and DuBois entered into a Settlement Agreement to resolve Ecolab's potential patent infringement claims relating to the Asserted Patents (the '257 Patent, '381 Patent, and '215 Patent). (*Id.*) Pursuant to the Settlement Agreement, DuBois agreed to take certain actions regarding the application of the Accused Products by its customers to avoid infringement of the Asserted Patents (*i.e.,* apply with a brush mechanism, not a non-energized nozzle). However, the Settlement Agreement imposes an additional requirement that is not relevant to the Asserted Patents – namely, requiring "the brush bristles of each brush remain substantially in contact with the conveyor surface whenever Dry Lube is being applied during conveyor operation." (*Id.*) This is defined as the "Guidance" under the Settlement Agreement. (*Id.* at 2-3, Section 1.1.) Accordingly, Ecolab's alleged violations, purportedly subject to its breach of contract claim, are broader than the alleged violations purportedly subject to its patent infringement claim.[6] The date to complete the compliance checks and bring all plants into compliance under the Settlement Agreement was extended by agreement to September 15, 2020. Ms. McCloskey relies on September 15, 2020, as the first date of possible violation of the Settlement Agreement. (Ex. CC, McCloskey Rpt. at 14.)

### B.  Ms. McCloskey's Patent Infringement Damages Based on a Hypothetical Negotiation Obviate Ecolab's Ability to Separately Recover Damages for Breach of Contract

Ms. McCloskey opined that the proper form of patent damages in this case is a reasonable royalty, and that the hypothetical negotiation between Ecolab and DuBois would have occurred in 2015 (six years before this lawsuit was filed). (Ex. CC, McCloskey Rpt. at 5, 23.) She also opined that the parties would have had the foresight to know that DuBois would acquire certain assets

---

[6] While a customer's application of an Accused Product in any manner other than by brushes in substantial contact with the conveyor would allegedly be considered a violation of the Settlement Agreement, only application of an Accused Product through a non-energized nozzle or non-energized nozzles would allegedly infringe the Asserted Patents.

20

from ICC in 2019, and would have considered that acquisition as part of that 2015 hypothetical

negotiation.  (*Id.* at 23; Ex DD, McCloskey Dep. at 101:6-102:15.)  In determining the royalty base

for her patent infringement damages, Ms. McCloskey calculated three alternative royalty bases.

(*See Infra* Section V.C.1.)  In calculating Alternative No. 2, Ms. McCloskey explained:

> [T]he second alternative that we talked about where it includes all DuBois' sales of
> dry lubricant is based on the – when – when doing a hypothetical negotiation, that
> DuBois and Ecolab would have agreed to include all sales rather than – all sales
> rather than have to try to police compliance with the license.

(Ex. DD, McCloskey Dep. at 99:12-18.)  According to Ms. McCloskey:

> First, with respect to the nature and scope of the license granted in the hypothetical
> negotiation, Ecolab would be granting DuBois an unrestricted license to use the
> patents in suit, which would command a higher royalty. **[DuBois' expert] appears
> to agree with this premise in theory, but also believes that the terms of the
> Settlement Agreement would still apply wherein Dry Lubricants must be
> applied with a brush. This is incorrect.** The terms of the Settlement Agreement
> are intended to allow DuBois to continue selling its Dry Lubricants *without* using
> the Ecolab patented method. In fact, the Settlement Agreement is irrelevant to the
> hypothetical negotiation because DuBois would be granted a license to use the
> patents in suit before the Settlement Agreement came into existence. If it had
> negotiated a license to Ecolab's patents, DuBois would have the freedom and
> flexibility to offer a variety of application methods to its customers (including using
> the brush *and/or* spray methods at issue in this case) without restriction or risk of
> infringing. **In addition, an unrestricted license allowing for the use of Ecolab's
> patents would relieve DuBois, its field representatives, and its customers from
> the responsibility to ensure compliance with the terms of the Settlement
> Agreement.** Clearly there is substantial value to having an unrestricted license.

(Ex. GG, McCloskey Dep. Ex. 380, McCloskey Reply Rpt. at 16-17 (emphasis added).)[7]  Ms.

McCloskey further explained:

---

[7] *See also* McCloskey Rpt. at 30 ("Further, Ecolab has a long history of trying to enforce its patent
rights against ICC and now DuBois.  The repeated past violations of Ecolab's patent rights by ICC,
the Catroneos, and ICC employees (and now DuBois) weigh heavily in favor of negotiating a fair
yet **all-encompassing license** to address DuBois' infringement."); *id.* at 32 ("This situation
indicates that DuBois needed a **license to enable customers to use Dry Trac in the infringing
method** and would be willing to pay the royalty amounts reasonably demanded by Ecolab in order
to obtain such a license.") and ("DuBois could not control how its Dry Lubricants were used and
would benefit from a **blanket license to be able to use the Ecolab patented method** which is
superior to using alternative application methods, like brushes.")

> And if DuBois was given a license to the Ecolab products, it would have the freedom to offer a customer whatever means it wanted to apply the dry lubricants. . . . **it would have been very beneficial to DuBois to not have to spend all the time, effort, and frustration of trying to comply with the settlement agreement.** And so in my opinion, that would have played heavily in favor of there being a **blanket license** for the patented methods.

(Ex. DD, McCloskey Dep. at 123:10-124:4 (emphasis added).)[8]

According to Ms. McCloskey and her Alternative No. 2, in 2015, DuBois would have agreed to a blanket license from Ecolab, paying a reasonable royalty rate on a royalty base comprising 100 percent of DuBois' Accused Product sales, whether they are applied in an allegedly infringing manner or not. Her hypothetical posits that DuBois would do so because it would have known that it was going to acquire certain assets of ICC in 2019, and because it wanted to offer its customers the freedom to apply the DuBois Accused Products in any manner they saw fit, whether via non-energized nozzles, brushes, or another method. Under this scenario, she asserts that DuBois would not have entered into the Settlement Agreement nor been burdened with its attendant compliance obligations. In other words, the 2015 patent license would have obviated the need for the 2020 Settlement Agreement, by having DuBois pay a reasonable royalty to Ecolab on 100 percent of all future dry lubricant sales, regardless of whether the application was infringing or noncompliant. Notably, Ms. McCloskey's Alternative No. 2, offers no apportionment nor adjustment for non-infringing applications and for this reason alone, is fatally flawed and warrants exclusion. (*Infra* Section V.C.1.) Alternatively, if the opinion on Alternative No. 2 is permitted, Ms. McCloskey's opinions regarding Ecolab's expectation damages for breach of the Settlement Agreement should be excluded because setting the royalty base at 100% of all of DuBois's dry

---

[8] *See also* McCloskey Dep. at 135:1-7 ("So when you're – when you're talking about applying the dry lubes and the profitability of the dry lube products, the hypothetical negotiation is trying to address giving DuBois a license for the Ecolab patents so that it had the freedom to offer the customers any ability to – any method of application.")

lubricant sales subsumes Ecolab's separate claim for damages for breach of the Settlement Agreement, *i.e.*, it is the maximum damages calculation that Ecolab can recover on its claims assuming damages for both breach of contract and patent infringement.

**C.    The Court Should Exclude Ms. McCloskey's Opinions Regarding Patent Infringement Damages**

**1.    Ms. McCloskey Grossly Overstates the Royalty Bases Used in Her Patent Infringement Damages Calculations**

Alternatively, if Ecolab is allowed to maintain separate damages claims for patent infringement and breach of contract, then Ms. McCloskey has grossly overstated the royalty base in her patent infringement damages calculations.

According to Ms. McCloskey, "the appropriate starting point to determine the royalty base is to begin with the total revenues DuBois obtained from the sale of its Dry Lubricants." (Ex. CC, McCloskey Rpt. at 36.)  In making this assumption, Ms. McCloskey makes no attempt to limit her royalty base to the allegedly infringing activity.  Pursuant to the Court's Memorandum Order on May 27, 2022, (the "Order") the scope of infringement of the Asserted Patents is limited to application of the Accused Products through non-energized nozzles, and application of the Accused Products through any other means (i.e., brushes, cloth rags, etc.) would not infringe the Asserted Patents.  (*See* D.I. 86 at 4.)  Yet, Ms. McCloskey includes all sales of Dubois' Accused Products, regardless of the application method, thereby significantly overstating the royalty base.

Ms. McCloskey offers three alternative royalty base calculations:

<u>Alternative No. 1</u>: If Ecolab is entitled to damages for both breach of contract and patent infringement, those sales of DuBois' Accused Products subject to breach of contract damages must be subtracted from the Total Royalty Base, and all remaining U.S. sales of DuBois' Accused Products would be included in the royalty base.  ("So it's – DuBois sales of dry lubricants from April 23, 2015, which is six years prior to the complaint, through – for the Super Loob and Smart Track and then any Dry Trac sales that were not already included in the [breach of contract] damages.") McCloskey Dep. at 97:19-23.

Alternative No. 2: If Ecolab is only entitled to patent infringement damages and not breach of contract damages, then the royalty base includes *all* U.S. sales of DuBois Accused Products from April 23, 2015 to the present (the "Total Royalty Base").

Alternative No. 3: If Ecolab is not entitled to breach of contract damages, but is entitled to patent infringement damages only relating to the specific documented infringement by location, then the royalty base would include (i) "all of DuBois' sales of Accused Products from April 23, 2015 through March 23, 2020," and (ii) "only a subset of DuBois' sales of Dry Lubricants on or after March 24, 2020 [the effective date of the Settlement Agreement] based on DuBois' documented infringement by location."[9]

(Ex. CC, McCloskey Rpt. at 19, 37-38; Ex. DD, McCloskey Dep. at 96:15-100:18.)

"Royalties are ordinarily computed based upon the sales of a patented product or process."

*Embrex, Inc. v. Serv. Eng'g Corp.*, 216 F.3d 1343, 1350 (Fed. Cir. 2000).  In *Niazi Licensing Corp. v. St. Jude Medical S.C., Inc.*, 30 F.4th 1339, 1356-58 (Fed. Cir. 2022), the Federal Circuit affirmed the District Court's exclusion of the opinions of the patentee's damages expert involving a method claim, where the expert based the royalty on the sales of four components used to practice the claimed method rather than on the use of the method itself.  The Court found that "[the expert] included in his damages calculations sales of all of [the defendant's medical devices], even though it was undisputed that not all of those sold devices had been used to practice the claimed method. (*Id.* at 1357.)  The Court held that:

Whether one refers to this as failure to "apportion" as the parties and district court did or as failing to limit damages to a reasonable approximation of actual infringing uses of the claimed method, Mr. Carlson's failure to account for noninfringing uses of the sold devices was legally improper. In this regard, we disagree with Niazi's carefully worded assertion on appeal that apportionment does not apply to method

---

[9] Per Exhibit 6 of the McCloskey Report, the "documented infringements by location" all occur after November 7, 2019.  Ms. McCloskey does not point to any evidence that DuBois' Super Loob OF and TM Smart Track Dry Lubricant products were ever applied through non-energized nozzles prior to November 7, 2019, and thus should be included in the royalty base.  While Super Loob OF may have been applied via nozzles prior to the steps taken by DuBois per the terms of the Settlement Agreement, TM Smart Track has always been applied via a brush system, and never via nozzles.  (*See supra* Section IV.C.1.5.)  *See* McCloskey Dep. at 149:14-18: "Q. Do you know whether any customer of DuBois from 2015 to today has ever applied Smart Track to a conveyor line using a nonenergized nozzle?  A. I don't have a specific example to give you."

claims. Damages should be apportioned to separate out noninfringing uses, and patentees cannot recover damages based on sales of products with the mere capability to practice the claimed method. Rather, where the only asserted claim is a method claim, the damages base should be limited to products that were actually used to perform the claimed method. *Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, 576 F.3d 1348, 1358-59 (Fed. Cir. 2009).

*Id.*

In this case, despite the fact that the vast majority of DuBois' sales of the Accused Products are not associated with alleged patent infringement, Ms. McCloskey chose to include 100 percent of DuBois' sales of the Accused Products in her royalty base, rather than limiting or apportioning her royalty base to the sales of the Accused Products associated with instances of alleged infringement. For Alternative No. 1, her royalty base comprises 100 percent of all DuBois' sales that are excluded from the breach of contract calculation.  For Alternative No. 2, her royalty base comprises 100 percent of all DuBois' sales from April 23, 2015 to the present.  And, for Alternative No. 3, her royalty base includes 100 percent of all DuBois' sales from April 23, 2015 through March 23, 2020.  Ms. McCloskey's royalty base opinions are grossly overstated, flawed, and unreliable, and should be excluded.

### 2.  Ms. McCloskey Improperly Assumes that "Unspecified Noncompliance" Violations Under the Settlement Agreement Are All Patent Infringements

Pursuant to the Settlement Agreement between DuBois and Ecolab, during the normal course of business, DuBois is required to inspect the application equipment at all facilities that have purchased Dry Lube from DuBois to ensure the customer is following the Guidance. (D.I. 1-1 at 4, Settlement Agreement, §2.3.)  "DuBois must maintain documentation of these visits and of customer adherence to the Guidance." (*Id.*)  In order to capture the information relating to DuBois' compliance with the Settlement Agreement, and to report same to Ecolab on a monthly basis, DuBois created a Microsoft Excel report, known as the "Compliance Visit Spreadsheet," which summarizes the individual service reports generated from customer visits. (Ex. EE, Excerpts from

A. Catroneo Dep. Ex. 219, DCI 0090435.)  Column P of the spreadsheet asks "Are all lines at this site fully in compliance with brushes in substantial contact with the conveyer surface? (including after any corrective action you took during your visit)," while Column Q asks "If you found any lines not to be in compliance, please list each line for which you found an issue then summarize your findings and corrective actions. Dry Lube can only be applied using a brush . . ." (*Id.*)  In completing those columns, on several occasions, Column P of the spreadsheet is blank, while Column Q states "yes" without any further detail or explanation of the non-compliance with the Settlement Agreement. (*Id.*)

In identifying "DuBois' Documented Infringements by Location" for purposes of her damages calculation under her Alternative No. 3, Ms. McCloskey categorizes all 83 of these reported violations of the Settlement Agreement (i.e., answering "yes" in Column Q without any further detail) as "Unspecified noncompliance". (Ex. CC, McCloskey Rpt., Exhibit 6, Column "Infringing/Noncompliant Activity".)  Ms. McCloskey then makes the unsupported leap that each of these 83 "unspecified noncompliance" activities are instances of patent infringement: "if the visit report or the service report show – did not describe what the problem was but that identified that there was some problem, then I've assumed that it was an infringement." (Ex. DD, McCloskey Dep. at 37:14-18.)   Ms. McCloskey's erroneous categorization of these 83 "unspecified noncompliance" instances as patent infringement instances is glaring given that Columns P and Q of the Compliance Visit Spreadsheet are both crafted to capture instances of noncompliance with the Settlement Agreement, not patent infringement, and none of these instances identified any act of infringement; only a blank line in Column P and a "yes" in Column Q.

Compounding Ms. McCloskey's error is the fact that she blatantly ignores DuBois' responses to Column R of that same Compliance Visit Spreadsheet, which does provide for a

reporting by DuBois of patent infringement instances. Column R asks "Did you find any instances where brushes have been removed and/or replaced with another form of application (i.e., an orifice reduction disc or other type of nozzle)? If yes, please provide summary..." In response to each and every one of the incidents where Ms. McCloskey found patent infringement from "unspecified noncompliance" based on a blank response in Column P and a "yes" response in Column Q, DuBois responded in Column R "no" it did not find an orifice reduction plate (i.e., pin spray nozzle) or other type of nozzle.

Because Ms. McCloskey has mischaracterized the instances of "unspecified noncompliance" as patent infringements, and included those instances in her patent infringement damages calculations under Alternative No. 3, McCloskey's patent infringement damages opinions should be excluded as unreliable to the extent they rely on or include these "unspecified noncompliance" instances.

### 3.    Ms. McCloskey Applies Unreliable and Flawed Methodology to her Analytical Approach Analysis

As an alternative to her *Georgia-Pacif*ic analysis, Ms. McCloskey also conducted an analysis under the "analytical approach" in which she compared DuBois' profit margin on DryTrac to DuBois' profit margin on DuBois' full line of food and beverage ("F&B") products, concluding that "DuBois enjoys a significant premium on profits from DryTrac when compared to its profits from the full food and beverage product line." (Ex. CC, McCloskey Rpt. at 34, §8.1.4.2.) Ms. McCloskey's comparison of DryTrac profits to the profits from an expansive industry product line that includes cleaning & sanitation products and food additives, and not a similar lubricant product or product line, is an improper application of the analytical approach.

In *Sprint Commc'ns Co. LP v. Charter Commc'ns, Inc.*, No. CV 17-1734-RGA, 2021 WL 982732, at *10-11 (D. Del. Mar. 16, 2021) (Andrews, J.) (citations omitted), this Court affirmed

27

the use of the analytical approach, "where the infringer's usual net profit is subtracted from its anticipated net profit realized from sales of infringing products." In *Sprint Commc'ns*, the Court approved of the use of the analytical approach in which the plaintiff's expert "subtracted the 'normal' industry profits from the expected VoIP profits, resulting in a VoIP profit premium." (*Id.* at \*11.) This comparison was *product specific* – comparing the net profits of the accused product utilizing infringing technology to the normal industry profits for the same or similar products. (*Id.*) Such a comparison is necessary to isolate the value of the patented technology.

Ms. McCloskey made no attempt to conduct an apples-to-apples comparison of DuBois' net profit from DryTrac when utilized in an infringing manner (*i.e.*, applied via a non-energized nozzle) to DuBois' net profit from DryTrac when utilized in a non-infringing manner (*i.e.*, applied via a brush or different brush mechanism). Nor did Ms. McCloskey compare DuBois' net profit from DryTrac to the normal industry net profits for dry lubricants. Ms. McCloskey also acknowledged that she did not know what products even comprised the "Full Line of F&B products". (Ex. DD, McCloskey Dep. at 136:14-20.) Because she does not know what products comprise the F&B line, Ms. McCloskey cannot know whether the profit differential for the F&B line relates to far more than just the allegedly infringing technology.

Because Ms. McCloskey relied on improper methodology in her application of the analytical approach to her patent infringement damages calculations, her opinions relating to the analytical approach are unreliable and should be excluded.

### 4. Ms. McCloskey Improperly Relies on the Incomparable Ecolab-ICC Settlement of the ICC Action

As part of forming her opinions regarding Ecolab's patent infringement damages, and in particular that Ecolab is entitled to an ███ reasonable royalty rate, Ms. McCloskey considered the Ecolab-ICC settlement of the ICC Action in supporting her reasonable royalty rate calculation:

Ecolab entered into the ICC Settlement in 2020 in which ICC paid Ecolab ███████ ██████ to settle all claims of the 2018 ICC Lawsuit. I have reviewed the sales data produced in the 2018 ICC Lawsuit which showed that ICC sold ████████ ████████ equivalent RTU gallons of Dry Trac products between 2012 and 2019. This indicates that the ICC Settlement represented compensation equal to ████████ ██████.

(Ex. CC, McCloskey Rpt. at 34.)  Ms. McCloskey stated:

> "when a **sufficiently comparable license** is used as the basis for determining the appropriate royalty, further apportionment may not necessarily be required. That is because a damages theory that is dependent on a comparable license (or a comparable negotiation) may in some cases have 'built-in apportionment.'  Built-in apportionment effectively assumes that the negotiators of a comparable license settled on a royalty rate and royalty base combination embodying the value of the asserted patent." **This is precisely the case of the 2020 Settlement Agreement between Ecolab and ICC**. . . .

(*Id.* at 36 (emphasis added).)

The Federal Circuit has recognized a "longstanding disapproval of relying on settlement agreements to establish reasonable royalty damages." *Sprint Commc'ns,* 2021 WL 982732, at *10 (*quoting Laser Dynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 77 (Fed. Cir. 2012)). "Similarly, this Court has observed that 'Federal Circuit precedent is hostile toward using litigation settlement agreements in proving a reasonable royalty, except in limited circumstances.'" (*Id.*) (*quoting M2M Sols. LLC v. Enfora, Inc.*, 167 F. Supp. 3d 665, 678 (D. Del. 2016)).  That is because "[t]here is minimal probative value in using litigation settlements to calculate a reasonable royalty, as the settlement agreement is not comparable to a negotiation between two willing parties." (*Id.*) "[L]icense fees negotiated in the face of a threat of high litigation costs may be strongly influenced by a desire to avoid full litigation." *Laser Dynamics,* 694 F.3d at 77 (citation omitted).  Indeed, the lump-sum amounts paid in a settlement agreement are (arguably) more indicative of a desire to avoid the cost of litigation than any actual value of the Asserted Patents.  Settlement agreements have "minimal probative value" because they are "not comparable to a negotiation between two willing parties," and that "minimal probative value is 'even less, where, as here, the settlement

29

agreements occurred years after the hypothetical negotiation.'" *Sprint Commc'ns*, 2021 WL 982732, at *10 (citation omitted). The hypothetical negotiation between Ecolab and DuBois took place in 2015, per Ms. McCloskey, five years prior to the 2020 Ecolab-ICC settlement.[10]

The Ecolab-ICC Settlement Agreement did not grant ICC a license to any of Ecolab's patents, trademarks, or other intellectual property, and ICC warranted that it was no longer engaged in the conveyor lubricant business. (Ex. FF, Green Dep. Ex. 33, Ecolab-ICC Settlement Agreement.) In her reply report, Ms. McCloskey stated that "[i]t should be noted that I am not opining that the ICC Settlement payment indicates an established royalty or a license agreement, rather, it indicates the value to Ecolab and ICC of the use of Ecolab's intellectual property in the use of Dry Trac products." (Ex. GG, McCloskey Reply Rpt. at 9.) Yet, she later states "there are differences between the Ecolab-ICC Settlement Agreement and the agreement that resulted from the hypothetical negotiation between Ecolab and DuBois." (*Id.* at 15.) These statements beg the question – if Ms. McCloskey is not relying on the Ecolab-ICC Settlement to establish a royalty, then why is she relying on it at all.[11]

Because the Ecolab-ICC settlement (1) occurred five years after the hypothetical negotiation, (2) resolved long running and highly contentious litigation between Ecolab and ICC, and (3) is not a comparable license agreement, it is of little probative value and the Court should

---

[10] The "minimal probative value" of litigation settlements to calculate a reasonable royalty "is even less, where, as here, the settlement agreements occurred years after the hypothetical negotiation." *Sprint Commc'ns*, 2021 WL 982732, at *10 (citation omitted).

[11] The Ecolab-ICC Settlement Agreement was "made in the context of settling a litigation dispute, and thus did not reflect the royalty the parties would have reached just before infringement began." *Zimmer Surgical, Inc. v. Stryker Corp.*, 365 F. Supp. 3d 466, 496 (D. Del. 2019) (Andrews, J.) (quoting *MAZ Encryption Techs. LLC v. Blackberry Corp.*, No. 13-304-LPS, 2016 WL 4490706, at *1 (D. Del. Aug. 25, 2016)).

exclude any reliance by Ms. McCloskey on the Ecolab-ICC settlement as unreliable in determining or supporting her reasonable royalty rate opinions.

### 5.   Ms. McCloskey's Improperly Relies on the Incomparable Thonhauser Distributorship Agreement, Which She Did Not Review

In rendering her opinions on patent infringement damages, Ms. McCloskey improperly relies on a 2009 Distributorship Agreement between DuBois and Thonhauser USA, Inc. that she mis-categorizes and considers as a "license agreement".  (*See* Ex. CC, McCloskey Rpt. at 28, analyzing Georgia-Pacific Factor #12 – "[i]n addition, DuBois pays a royalty for one of its Dry Lubricants, TM Smart Track, ██████████████████████████████"); *id.* at 33-34, §8.1.4.2 – "[i]n fact, DuBois had a license agreement with Thonhauser in which DuBois shared ████████ ██████████ of TM Smart Track with Thonhauser" and "Assuming DuBois shared ██████████████ ██████████ from Dry Trac (similar to its agreement with Thonhauser), the royalty would equal ██████████ ██████████████████.").)

Contrary to Ms. McCloskey's self-serving categorization, the Thonhauser Agreement is not a license agreement.  It is a Distributorship Agreement pursuant to which Thonhauser manufactures the TM Smart Track Accused Product for DuBois, and pursuant to which DuBois services the product and customers on Thonhauser's behalf.  (Ex. HH, McCloskey Dep., Ex. 384.) The Distributorship Agreement exists because Thonhauser does not have a sales and service organization.  (*Id.*)  DuBois then invoices the customer and pays Thonhauser ██████████████████ collected on those invoices.  (*Id.*)  There are no patents referenced in the Thonhauser Agreement, and there are likewise no patents licensed under the Thonhauser Agreement.  (*Id.*)  In fact, the term "license" is not used in the agreement.  (*Id.*)  Nor is the term "royalty" used in the agreement; instead, the agreement states that "Distributor shall collect all fees generated from contracts with its customers and pay ██████████████████████ to Supplier." (*Id.* at Section 7.1.)

31

It is not surprising that Ms. McCloskey would mis-categorize and mis-apply the Thonhauser Agreement to her patent infringement damages analysis, because she has never seen or reviewed the agreement, is not familiar with the terms of the agreement, and does not "have any direct understanding of what the agreement is." (Ex. DD, McCloskey Dep. at 129:9-130:19.) Ms. McCloskey also acknowledged that the relationship between Thonhauser and DuBois is not analogous or comparable to the relationship between DuBois and Ecolab in a hypothetical negotiation.[12]

Because the Thonhauser Agreement is not analogous or comparable, and because Ms. McCloskey never reviewed the agreement, her opinions relating to, and relying upon, the Thonhauser Agreement are unreliable and should be excluded.

### D. The Court Should Exclude Ms. McCloskey's Opinions Regarding Breach of Contract Damages

#### 1. Ms. McCloskey Applies Fundamentally Flawed and Unreliable Methodology in Calculating Expectation Damages for Breach of Contract

Ecolab's damages for breach of contract are based on Section 3.2 of the Settlement Agreement which provides:

> 3.2. If a second violation is discovered at the same customer, DuBois must not sell Dry Lube to the customer again until DuBois can be reasonably assured the customer can remain in compliance.

(Ex. CC, McCloskey Rpt. at 15.) To calculate her "expectation damages" for DuBois' breach of the Settlement Agreement, Ms. McCloskey "considered all sales by DuBois to any customer that

---

[12] "[T]he plaintiff must show that the scope of the prior license agreements that it intends to rely on is comparable to the scope of the license the parties would negotiate for the patents-in-suit." *AVM Techs.* 2013 WL 126233, at *3. Here, to the contrary, Ms. McCloskey acknowledged that the hypothetical negotiation between Ecolab and DuBois would result in a bare license agreement, and there would be no manufacturer relationship, supplier relationship, or distributor relationship, between DuBois and Ecolab as a result of a hypothetical negotiation. (*See* Ex. DD, McCloskey Dep. at 130:20-131:24.)

had a second violation of the guidance set forth in the Settlement Agreement after September 15, 2020, to be a sale that Ecolab would have made because DuBois should have stopped selling to that customer in accordance with Section 3.2 of the Settlement Agreement." (*Id.*)  Ms. McCloskey's analysis employs numerous faulty methodologies causing her to significantly overstate damages, resulting in an unreliable damages opinion that must be excluded.

First, Ms. McCloskey assumes that Section 3.2's reference to "customer" means a corporate customer, not an individual plant. (*See* McCloskey Reply Rpt. at 3 ("each "customer" for purposes of Section 3.2 is appropriately considered at the corporate level."); *see also* Ex. DD, McCloskey Dep. at 71:22-72:21.)  However, "customer" is not a defined term in the Settlement Agreement, and other references to "customer" in the Settlement Agreement confirm that the "customer" is at a plant level.  For example,

> [Section 1.2 states:] *action with respect to current DuBois **customers***: (A) send a letter transmitting the Guidance to the **plant manager (or equivalent) of each facility** that has purchased Dry Lube directly from ICC or DuBois, (B) … and (C) inspect the application equipment at **all facilities** that have purchased Dry Lube directly from ICC or DuBois …

> [Section 1.6 states:] Within 90 days of the Effective Date, DuBois must provide notice to outside counsel for Ecolab to include, **for each plant subject to Section 1.2**: (A) the date on which a letter transmitting the Guidance was sent; (B) the date on which an acknowledgement of receipt of the Guidance **from each plant** was received by DuBois; and (C) the date on which **each plant** was visited by DuBois to ensure compliance and confirming that each application station was (i) in compliance; (ii) brought into compliance; or (iii) requesting the extension discussed in Section 1.3.

> [Section 2.1 states:] For clarity, *a new **customer*** or distributor under this Section includes **any plant or distributor location** that (1) did not previously purchase or use . . .

(D.I. 1-1., Ex. A, at 2-4.)  Similarly, Section 3.2 – the clause alleged to be breached by DuBois – uses the word "**at**", which indicates a location not an identity.  (*Id.* at 4.)  A plant/facility is known by its location.  Perhaps most telling, Ecolab defines "customers" in its Complaint as the bottling plants: "**DuBois's customers—namely, the bottling facilities** that purchase DuBois's Accused

33

Lubricants—directly infringe . . ." (*See* D.I. 1, Complaint, at ¶¶34, 37, 51, 54, 69, and 72.) Likewise, Ecolab's counsel described a "customer" as an individual plant location in the depositions of DuBois' fact witnesses: "And maybe we're using the word customer differently. I am referring to individual plant locations." (Ex. II, Justus Dep. Vol. I at 26:23-24; *see also* Ex. V, A. Catroneo Dep. at 16:2-17:19, 56:17-60:23.)  Similarly, in a June 7, 2020 email to DuBois regarding adherence to the Settlement Agreement, Ecolab's counsel wrote that "as far as the list of customers visited . . . we expect the Section 1.6 reports will identify the customers *by name and location*." (Ex. JJ, Boscher Dep., Ex. 102, p. 2.)

Second, because Ms. McCloskey defines "customer" as a corporate level customer for purposes of Section 3.2, when identifying the two violations necessary to trigger Section 3.2, she identifies the first and second violations at any one or more of a corporate "customer's" plants, not the same plant. (Ex. DD, McCloskey Dep. at 73:21-74:9.)  This repeatedly results in Ms. McCloskey over-capturing violations triggering Section 3.2, and it prematurely starts the clock on Ecolab's alleged damages for the second violation.  For example, Ms. McCloskey acknowledged that where a corporate customer had multiple plant locations, if she found a first violation at one plant and a second violation at a second plant, it is her opinion that DuBois should stop selling dry lubricant product to that corporate customer and all of its plants, even if there are plants that have had no violations.  (*Id.*)  Because Ms. McCloskey improperly analyzed "customers" under Section 3.2 at the corporate level, rather than at the individual plant level, she cobbles together a first violation and a second violation, making her damages calculation overstated and entirely unreliable.

Third, as stated in the preceding paragraph, once Ms. McCloskey identifies a second violation at any plant or facility of a corporate "customer", she opines that DuBois must stop

34

selling to that corporate "customer" – i.e., all plant locations, regardless of whether those plants
have ever themselves had a violation.  This erroneous application of the stoppage requirement
across the entire corporate structure, rather than at specific plant locations, exacerbates the prior
error in Ms. McCloskey's damages calculation.

Fourth, Ms. McCloskey ignores the second half of Section 3.2 which provides that "DuBois
must not sell Dry Lube to the customer again **until DuBois can be reasonably assured the
customer can remain in compliance.**" (D.I. 1-1 at 4.)  Ms. McCloskey makes no effort to
determine if or how DuBois would be "reasonably assured" that a customer can remain in
compliance sufficient to allow continued selling to that customer.  According to Ms. McCloskey,
"[a]fter a customer had been found noncompliant on two occasions, I understand that DuBois
should have stopped selling to that customer, meaning further instances of noncompliance are
irrelevant." (Ex. GG, McCloskey Reply Rpt. at 3-4.)  "Reasonably assured" is not defined in the
Settlement Agreement.  (*See generally* D.I. 1-1 at 2-11.)  Instead, reasonable assurance rests on
DuBois' subjective belief as to whether its customers can remain in compliance.  In this case,
DuBois has always reasonably believed its customers can remain in compliance. (Ex.T, Justus
Dep. Vol II at 69:8-70:18, 121:5-21.)  In fact, the limited number of alleged violations relative to
the tens of thousands of compliant brushes in operation, confirms the reasonableness of that belief.
(*See* Ex. Z, Bilski Declaration, D.I. 69 at 26.)  The record evidence fails to demonstrate that DuBois
sold Accused Products to a customer that it did not reasonably believe could remain in compliance.
Specifically, there is no evidence that a customer's refusal to comply with the guidance, nor that
any customer willfully violated the Guidance.  No reasonable jury could find that DuBois lacked
reasonable assurance, or that DuBois' customers could not remain in compliance.  Instead, Ms.
McCloskey's analysis invites Ecolab to take an unreasonable position – ignore the second half of

Section 3.2 (and DuBois' ability to continuing selling to customers) and apply a hard-and-fast rule that 100 percent of the sales from the date of the second violation to the present, at a corporate customer level, are the measure of damages. Again, by ignoring the second half of Section 3.2, Ms. McCloskey grossly overstates her damages calculation.

Finally, Ms. McCloskey assumes that, with DuBois no longer able to sell dry lubricant to its corporate "customer" following a second violation, 100 percent of those sales would go to Ecolab from that date to the present. (Ex. CC, McCloskey Rpt. at 16; Ex. DD, McCloskey Dep. at 78:19-79:2.)[13] Ms. McCloskey makes this assumption despite the fact that Ecolab only has █████ of the dry lubricant market. Ms. McCloskey is aware that there are competitors besides DuBois comprising the other █████ of the market,[14] but she summarily dismisses them as "unacceptable or unavailable substitutes" for DuBois' Accused Products. Ex. CC, McCloskey Rpt. at 17.) According to her, the only suitable option for the customers is Ecolab. This assumption completely ignores reality. First, Ms. McCloskey fails to consider that some of DuBois' customers had already made an intentional decision to stop using Ecolab lubricants in favor of DuBois' Accused Products or other competitors' products. Second, Ms. McCloskey ignores the fact that Krones, a leading manufacturer of conveyor lines for the industry, recommends brush application (*i.e.*, non-Ecolab) systems to its customers. (*See, e.g.*, Ex. V, A.

---

[13] (*See also* Ex. DD, McCloskey Dep. at 83:9-84:2: "Q. So I think you're saying is once that customer switched to Ecolab, switched back to Ecolab, the customer would then be buying its dry lubricant needs from Ecolab and would still be buying from Ecolab today? A. Yes. Barring different behavior from DuBois, yes. Q. Right. And so in your report, you captured 100 percent of DuBois' sales from the date of the second violation to today for each of these customers, correct? . . . A. Yes. Q. Okay. And it is your position that 100 percent of those sales would go to Ecolab? A. Yes.")

[14] (*See, e.g.*, Ex. CC, McCloskey Rpt. at 6: "Other competitors offer dry lubricant products that compete with Ecolab's DryExx® line of dry lubricant products.: *See also id*. at 17: "Ecolab's competitors share the remaining █████ the market.")

Catroneo Dep. at 76:3-77:18.)  Finally, Ms. McCloskey did not interview any of the customers, or review any statements or testimony from any of the customers.  (Ex. DD, McCloskey Dep. at 85:18-87:11.)  Likewise, she did not conduct or review any studies or surveys regarding (i) why customers chose to buy Ecolab's dry lubricant product, DuBois' dry lubricant product, or any other competitor's dry lubricant product, (ii) whether customers prefer DuBois' dry lubricant product over Ecolab's dry lubricant product, or (iii) whether customers prefer another competitor's dry lubricant product over Ecolab's dry lubricant product.  (*Id.*)  She has no evidence to support her assumption that 100 percent of DuBois' customers would turn to Ecolab to replace DuBois, instead of turning to other suppliers comprising the other ████ of the market.  Instead, she relies on pure speculation.  Even assuming, based on market share, that ████ of DuBois' customers would turn to Ecolab over another competitor, that would cut Ms. McCloskey's damages calculation ████.

Because the methodology employed by Ms. McCloskey to calculate "expectation damages" for breach of the Settlement Agreement is faulty and unreliable, the Court should exclude Ms. McCloskey's expectation damages opinions.

> **2.    Ms. McCloskey's Breach of Contract Damages Relating to Spray Bottles Should be Excluded Because the Settlement Agreement Does Not Apply to Spray Bottles**

According to its plain language, the Settlement Agreement does not cover spray bottles, but rather, "application equipment" at "application stations":

- Section 1.2: "Within 60 days of the Effective Date, DuBois must take the following action with respect to current DuBois customers: . . . (C) inspect the **application equipment** at all facilities that have purchased Dry Lube directly from ICC or DuBois to ensure that all **application stations** applying said lubricant use a brush mechanism, wherein the brush bristles of each brush remain substantially in contact with the conveyor surface whenever Dry Lube is being applied during conveyor operation."

37

- Section 1.3: "If during the inspection specified in Section 1.2, DuBois identifies **an application** that cannot be brought into compliance within the 60-day period, DuBois will identify the issue to Ecolab and provide a proposed time frame for remedy."

- Section 1.6: "Within 90 days of the Effective Date, DuBois must provide notice to outside counsel for Ecolab to include, for each plant subject to Section 1.2: . . . (C) the date on which each plant was visited by DuBois to ensure compliance and confirming that each **application station** was (i) in compliance; (ii) brought into compliance; or (iii) requesting the extension discussed in Section 1.3."

- Section 2.3: "During the normal course of business operations, DuBois must inspect the **application equipment** at all facilities that have purchased Dry Lube directly from DuBois to ensure the Guidance is being followed. DuBois must correct all instances of noncompliance when they are discovered, or as soon thereafter as possible. DuBois must maintain documentation of these visits, and of customer adherence to the Guidance."

(D.I. 1-1, Ex. A at 2-4.) Nonetheless, ignoring this plain language, Ecolab alleges that customers have used spray bottles to apply dry lubricant in violation of the Settlement Agreement. Specifically, Ecolab alleges that spray bottles were filled with the Accused Products, and that using the spray bottles, customers have applied or spray-applied the Accused Products on a conveyor. If the customer allegedly sprayed the Accused Products directly onto the conveyor using the spray bottle, Ecolab contends that is an infringing act. (*See* Ex. D, Rothstein Rpt., Exhibits B-D.) If the customer allegedly sprayed the Accused Products onto a towel or rag using the spray bottle, and then wiped the Accused Products on the conveyor, Ecolab concedes that is not an infringing act. (*Infra* Section IV.C.4.) However, whether the Accused Products are sprayed directly onto a conveyor, or wiped onto a conveyor, using a spray bottle, Ecolab alleges both actions breach the Settlement Agreement. The plain language of the Settlement Agreement indicates otherwise.

As Sections 1.2, 1.3, 1.6, and 2.3 of the Settlement Agreement make clear, the Settlement Agreement requires DuBois to inspect the "application equipment" to ensure that the "application stations" are in compliance with the Guidance under the Agreement. An "application station" indicates a stationary piece of equipment (i.e., a stationary location) used to apply the Accused

38

Products.  There can be no reasonable argument that a spray bottle is an "application station."

"Application equipment" and "application station" refer to the automated nozzles and related

equipment that Ecolab also alleges are at issue.  (Ex. E, Rothstein Dep. at 120:13-18.)  Ecolab has

pled as much.  (*See* D.I. 1, Complaint, at ¶¶ 28-30, 46-47, 63-65 ("DuBois sets up the **application**

**equipment** at its customers' facilities to apply the Accused Lubricants . . .  to . . . a portion of the

container-contacting surface of the conveyors."  "DuBois has set the **application parameters** for

the Accused Lubricants to reflect a ratio of applied:not applied time of at least 1:10."  "DuBois has

set up the **application equipment** at its customers' facilities to apply the Accused Lubricants

through non-energized nozzles.").)   Likewise, Ecolab's technical expert, Dr. Rothstein has

admitted as much.  In response to what constitutes an "application station" as that term is used

regarding lubrication systems for lubricating a conveyor bottle line, Dr. Rothstein states "my

understanding of the 'application station' *is a location along the conveyor belt* where the dry

lubricant is applied."  (Ex. E, Rothstein Dep. at 115:7-22.)  Additionally, in response to whether

you typically see more than one dispensing mechanism at an application station, Dr. Rothstein

responds "[t]ypically, yes. But not -- it doesn't have to be the case."  (*Id.* at 115-116.)

In contrast to the "application equipment" and "application station" governed by the

Settlement Agreement, a "spray bottle" refers to a manually actuated spray bottle that can be

carried around by a customer.  Nonetheless, Ms. McCloskey has included in her expectation

damages for breach of contract, all instances of a customer's alleged use of a spray bottle.  (Ex.

DD, McCloskey Rpt., Exhibit 6.)  Because the plain language of the Settlement Agreement limits

DuBois' obligations thereunder to "application equipment" at "application stations", and because

a "spray bottle" is neither, the Court should exclude Ms. McCloskey's opinions on breach of

contract damages opinions based on the alleged use of spray bottles as unreliable.

**3.    Ms. McCloskey's Unjust Enrichment Damages for Breach of Contract Should be Excluded, and DuBois is Entitled to Summary Judgment on Ecolab's Unjust Enrichment Claim**

Although Ecolab did not plead unjust enrichment as either a claim or a remedy in its Complaint, Ms. McCloskey offers "[a]n alternative remedy for DuBois' breach of the Settlement Agreement . . . under an unjust enrichment theory." (Ex. DD, McCloskey Rpt. at 18-19, §7.3.) However, damages under an "unjust enrichment theory" (*i.e.*, disgorgement of profits) are not an appropriate remedy for a breach of contract claim under Delaware law. As this Court has made clear, "a party generally cannot seek recovery under an unjust enrichment theory if a contract is the measure of the plaintiff's right." *Pedrick v. Roten*, 70 F.Supp.3d 638, 652-653 (D. Del. 2014) (citing *ID Biomedical Corp. v. TM Techs.*, Inc., No. 13269, 1995 WL 130743, at *15 (Del. Ch. Mar. 16, 1995). *See also Bakerman v. Sidney Frank Imp. Co., Inc.*, 2006 WL 3927242, at *18 (Del. Ch. Oct. 10, 2006).

Because Ecolab has alleged a claim for breach of contract against DuBois involving an express, enforceable contract, Ms. McCloskey's opinions relating to unjust enrichment should be excluded. In addition, to the extent that Ecolab is asserting a claim, or alternative remedy, for unjust enrichment, DuBois is entitled to summary judgment barring such a claim/remedy.

## VI.    CONCLUSION

For the reasons provided above, no dispute of material fact remains and the Court should: (1) dismiss Ecolab's claim for direct infringement; (2) grant summary judgment of (a) no direct infringement by DuBois; (b) no indirect infringement by DuBois, and (c) non-infringement through the use of brushes, TM Smart Track, non-direct conveyor application, and spray bottles; and (3) exclude Ms. McCloskey's unreliable and insufficiently supported opinions.

Respectfully submitted,

DEVLIN LAW FIRM LLC

/s/ *James M. Lennon*

James M. Lennon (No. 4570)
1526 Gilpin Avenue
Wilmington, DE 19806
(302) 449-9010
jlennon@devlinlawfirm.com

Lucas T. Elliot *(pro hac vice)*
FROST BROWN TODD LLP
150 3rd Avenue South, Suite 1900
Nashville, TN 37201
615.251.5565 (phone)
615.251.5551 (fax)
lelliot@fbtlaw.com

Alexander S. Czanik (*pro hac vice*)
FROST BROWN TODD LLP
301 East Fourth Street, Suite 3300
Cincinnati, OH 45202
513.651.6800 (phone)
513.651.6981 (fax)
aczanik@fbtlaw.com

*Attorneys for Defendant DuBois Chemicals, Inc.*

41

## CERTIFICATE OF SERVICE

I hereby certify that on this 9th day of June 2023, a true and correct copy of the foregoing has been sent, via email and/or first-class mail, postage prepaid to:

Kelly E. Farnan (#4395)
Dorronda R. Bordley (#6642)
Richards, Layton & Finger, P.A.
One Rodney Square
920 N. King Street
Wilmington, DE 19801
(302) 651-7700
farnan@rlf.com
bordley@rlf.com

Rachel Zimmerman Scobie
Eric R. Chad
Elisabeth Muirhead
Annaliese Mayer
Merchant & Gould P.C.
150 South Fifth Street
Suite 2200
Minneapolis, MN 55402-4247
(612) 332-5300
rscobie@merchantgould.com
echad@merchantgould.com
emuirhead@merchantgould.com
amayer@merchantgould.com

*Attorneys for Plaintiffs*
*Ecolab Inc. and Ecolab USA Inc.*

Dated: June 9, 2023

/s/ *James M. Lennon*
_____
James M. Lennon (No. 4570)

0126995.0727382    4870-9870-0392v18

42