## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

ECOLAB INC. and ECOLAB USA INC.,

Plaintiffs,

v.

DUBOIS CHEMICALS, INC.,

Defendant.

Civil Action No. 21-567-RGA

### MEMORANDUM OPINION

Kelly E. Farnan, Dorronda R. Bordley, RICHARDS, LAYTON & FINGER, P.A., Wilmington, DE; Anneliese S. Mayer, Elisabeth Muirhead, Eric R. Chad, Rachel Zimmerman Scobie, MERCHANT & GOULD, Minneapolis, MN.

     Attorneys for Plaintiffs.


James Michael Lennon, DEVLIN LAW FIRM LLC, Wilmington, DE; Alexander S. Czanik, FROST BROWN TODD LLP, Cincinnati, OH; Lucas T. Elliot, FROST BROWN TODD LLP, Nashville, TN.

     Attorneys for Defendant.


October 25, 2023

**ANDREWS, UNITED STATES DISTRICT JUDGE:**

Before me are two sets of motions. One is Ecolab's Motion for Summary Judgment, Motion to Limit Testimony of Jacques Rouillard and Motion to Limit Testimony of Christopher Gerardi. (D.I. 167). The other is Dubois Chemical, Inc.'s FRCP 12(c), Summary Judgment and Daubert Motions. (D.I. 170). I have considered the briefing. (D.I. 168, D.I. 184, D.I. 197, D.I. 172, D.I. 186, D.I. 195).

For the reasons set forth below, Ecolab's motion is GRANTED IN PART and DENIED IN PART. Dubois's motion is GRANTED IN PART and DENIED IN PART.

## I. BACKGROUND

This case is about dry lubricants for beverage bottle plant conveyor chains. (D.I. 1 at 1). Ecolab's dry lubricant product is DryExx, and Dubois's product is called Dry Trac. (D.I. 168 at 3-4). International Chemical Corporation, ICC, was DuBois' predecessor in interest and first marketed Dry Trac. (D.I. 1 at 2). In 2010, Ecolab sued ICC for patent infringement. (D.I. 169-1, Ex. 4). The parties settled the lawsuit in 2012. (D.I. 169-2, Ex. 6). In 2018, Ecolab sued ICC for breach of that settlement agreement and other claims, and at that time DuBois acquired ICC's conveyor lubricant business. (D.I. 1 at 3). Ecolab settled with both ICC and DuBois in 2020. (*Id.*). Ecolab is now suing Dubois for breach of the 2020 settlement agreement as well as infringement of U.S. Patent Nos. 7,741,257 ("the '257 patent"), 7,745,381 ("the '381 patent") and 8,058,215 ("the '215 patent"). (*Id.* at Counts I-III).

The 2020 settlement agreement requires DuBois to take certain actions including training relevant personnel on using Dry Lube[1], sending letters to customers and distributors, and more. (D.I. 1-1, Ex. A).

Ecolab moves for summary judgment that DuBois infringes claim 41 of the '257 patent, claim 1 of the '381 patent, and claim 1 of the '215 patent with its dry lubricant products Dry Trac and Super Loob OF. (D.I. 197 at 10-11). The asserted claims are all method claims for lubricating a conveyor using a non-energized nozzle. (D.I. 1 at 7, 10, 12).

Ecolab moves for summary judgment that DuBois breached the 2020 settlement agreement, partial summary judgment that "customer" in section 3.2 of the 2020 settlement agreement means the corporate entity that owns a plant, summary judgment that DuBois infringed the asserted patents, to limit the testimony of Jacques Rouillard, DuBois's technical expert, and to limit the testimony of Christopher Gerardi, DuBois's damages expert. (D.I. 168). Ecolab has moved for summary judgment on both theories of direct and indirect infringement. (*Id.*).

DuBois now moves for judgment on the pleadings that Ecolab did not plead direct infringement of the asserted patents, summary judgment of no direct or indirect infringement, to exclude Ms. McCloskey's testimony regarding patent infringement damages, and to exclude Ms. McCloskey's opinions regarding breach of contract damages. (D.I. 172).

## II. LEGAL STANDARD

### A. Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R.

---

[1] Dry Lube is defined as "any silicone-containing lubricant for intermittent application to a conveyor." (D.I. 1-1, Ex. A at § 1.1.).

CIV. P. 56(a). Material facts are those "that could affect the outcome" of the proceeding. *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "[A] dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the nonmoving party." *Id.* The burden on the moving party may be discharged by pointing out to the district court that there is an absence of evidence supporting the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

The burden then shifts to the non-movant to demonstrate the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Williams v. Borough of West Chester*, 891 F.2d 458, 460–61 (3d Cir. 1989). A non-moving party asserting that a fact is genuinely disputed must support such an assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials; or (B) showing that the materials cited [by the opposing party] do not establish the absence . . . of a genuine dispute . . . ." FED. R. CIV. P. 56(c)(1). The non-moving party's evidence "must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance." *Williams*, 891 F.2d at 460–61.

When determining whether a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). If the non-moving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex*, 477 U.S. at 322.

### B. Motion for Judgment on the Pleadings

A Rule 12(c) motion for judgment on the pleadings is reviewed under the same standard

as a Rule 12(b)(6) motion to dismiss when the Rule 12(c) motion alleges that the plaintiff failed

to state a claim upon which relief can be granted. See *Turbe v. Gov't of the Virgin Islands*, 938

F.2d 427, 428 (3d Cir. 1991); *Revell v. Port Auth.*, 598 F.3d 128, 134 (3d Cir. 2010). The court

must accept the factual allegations in the complaint and take them in the light most favorable to

the non-moving party. See *Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Christopher v. Harbury*,

536 U.S. 403, 406 (2002). "When there are well-ple[d] factual allegations, a court should assume

their veracity and then determine whether they plausibly give rise to an entitlement to relief."

*Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). The court must "draw on its judicial experience and

common sense" to make the determination. *See id*. In ruling on a motion for judgment on the

pleadings, the court is generally limited to the pleadings. *Mele v. Fed. Reserve Bank of N.Y.*, 359

F.3d 251, 257 (3d Cir. 2004). The court may, however, consider documents incorporated into the

pleadings and those that are in the public record. *Pension Ben. Guar. Corp. v. White Consol.*

*Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993).

### C. Daubert

Federal Rule of Evidence 702 sets out the requirements for expert witness testimony and

states:

> A witness who is qualified as an expert by knowledge, skill,
> experience, training, or education may testify in the form of an
> opinion or otherwise if: (a) the expert's scientific, technical, or other
> specialized knowledge will help the trier of fact to understand the
> evidence or to determine a fact in issue; (b) the testimony is based
> on sufficient facts or data; (c) the testimony is the product of reliable
> principles and methods; and (d) the expert has reliably applied the
> principles and methods to the facts of the case.

Fed. R. Evid. 702. The Third Circuit has explained:

> [T]he district court acts as a gatekeeper, preventing opinion
> testimony that does not meet the requirements of qualification,
> reliability and fit from reaching the jury. *See Daubert* ("Faced with
> a proffer of expert scientific testimony, then, the trial judge must
> determine at the outset, pursuant to Rule 104(a) [of the Federal
> Rules of Evidence] whether the expert is proposing to testify to (1)
> scientific knowledge that (2) will assist the trier of fact to understand
> or determine a fact in issue.").

*Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404–05 (3d Cir. 2003) (footnote

and internal citations omitted).[2] Qualification examines the expert's specialized knowledge,

reliability examines the grounds for the expert's opinion, and fit examines whether the testimony

is relevant and will "assist the trier of fact." *Id.* at 404.

## III.   DISCUSSION

### A.   Breach Of Contract

#### 1.   Construction Of "Customer"

Ecolab seeks partial summary judgment that "customer" in § 3.2 of the Settlement

Agreement means the corporate entity (say, Anheuser Busch) when a corporation owns multiple

bottling plants. (D.I. 168 at 15-16; D.I. 197 at 7-8). DuBois responds that "customer" only refers

to individual plants, so that if a corporation owns fifty bottling plants, that's fifty customers. (D.I.

184 at 14-19; *see* D.I. 172 at 33 (*Daubert* context)). DuBois cross-moves for partial summary

judgment in its favor on the interpretation of "customer." (D.I. 184 at 18-19).

The Settlement Agreement is a contract. It is governed by Delaware law. (D.I. 1-1, Ex. A

§ 19). The meaning of contract language is a matter of law, so it is properly resolved on motion

for summary judgment. *Am. Healthcare Admin. Servs., Inc. v. Aizen*, 285 A.3d 461, 475 (Del. Ch.

2022) (stating "[t]he proper interpretation of language in a contract, while analytically a question

---

[2] The Court of Appeals wrote under an earlier version of Rule 702, but the subsequent
amendments to it were not intended to make any substantive change.

of fact, is treated as a question of law both in the trial court and on appeal"). Absent ambiguity, the court "will give priority to the parties' intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all its provisions. *Id.* (quoting *In re Viking Pump, Inc.*, 148 A.3d 633, 648 (Del. 2016)). "If a writing is plain and clear on its face, i.e., its language conveys an unmistakable meaning, the writing itself is the sole source for gaining an understanding of intent." *Aizen*, 285 A.3d at 475 (quoting *City Investing Co. Liquidating Tr. v. Cont'l Cas. Co.*, 624 A.2d 1191, 1198 (Del. 1993)).

The parties agree that the contract is unambiguous. (D.I. 168 at 16; D.I. 184 at 15; D.I. 197 at 9). Therefore, I only look at the Settlement Agreement to determine the meaning of "customer" as it appears in § 3.2.[3] I will construe "customer" as an individual plant. From the four corners of the Settlement Agreement, the meaning of "customer" in § 3.2 is best understood at the individual plant level.

The Settlement Agreement does not expressly define "customer." The Settlement Agreement does use various terms that have to be taken into account in trying to interpret "customer," including "new customer," "current customer," "corporate customer," "same customer," "company," "plant," and "facilities."[4] (D.I. 1-1, Ex. A §§ 1.1, 1.2, 2.1, 3.1, 3.2).

I also consider that the Settlement Agreement was to resolve litigation, and that the seeming purpose of the agreement was to give Ecolab assurances that, going forward, DuBois and its customers would not infringe various Ecolab patents by limiting the customers' use of Dry Lube to brush applications. Any future direct infringement would take place in individual bottling plants,

---

[3] DuBois cites parol evidence (D.I. 184 at 18-19), which I do not take into account given the agreement that the contract is unambiguous.
[4] The Settlement Agreement also talks about "distributors," but neither side suggests that the use of "distributors" has any relevance to the dispute.

not at corporate headquarters. The Settlement Agreement was designed to prevent that infringement.

Section 1.1 is the first instance of the word "customer" appearing in the Settlement Agreement—DuBois must "distribute [the] Guidance to any current customer that has purchased Dry Lube directly from ICC or DuBois." (D.I. 1-1, Ex. A § 1.1).

Section 1.2 is the second instance of the word "customer" appearing in the Settlement Agreement. It is in the context of corrective action DuBois must take for current customers. It states:

> Within 60 days of the Effective Date, DuBois must take the following action with respect to **current DuBois customers**: (A) send a letter transmitting the Guidance to the **plant manager (or equivalent) of each facility** that has purchased Dry Lube directly from ICC or DuBois, (B) for **corporate customers**, send a letter transmitting the Guidance to the corporate person responsible for company's[5] compliance with laws and regulations, and (C) inspect the application equipment at all **facilities that have purchased** Dry Lube directly from ICC or DuBois to ensure [non-infringement].

(D.I. 1-1, Ex. A §1.2 (emphasis and footnote added)).

From the plain language of § 1.2, it is clear there are "corporate customers" and therefore there is a strong implication that there are also non-corporate customers. But what is a "corporate customer"? If an Anheuser Busch bottling plant in Boston order supplies from DuBois, is the bottling plant the "corporate customer," i.e., a customer that is part of a larger corporation, or is the "corporate customer" Anheuser Busch? The balance of this section certainly indicates the notice needs to go to, and be monitored at, the facilities where the infringement could occur, which is twice described as facilities that have "purchased Dry Lube directly from ICC or DuBois." In

---

[5] The use of the word "company" here is not remarked upon by the parties. I would normally expect a "corporate person" to be responsible for the *corporation's* compliance with the law.

normal English usage, a facility that purchases Dry Lube directly from DuBois would be a customer.

The next relevant section to this inquiry is § 1.6, which states that DuBois needs to give outside counsel for Ecolab notice of enumerated information "for each plant that is subject to Section 1.2." (D.I. 1-1, Ex. A §1.6). The notice called for in this section only relates to interactions between DuBois and "plants," including DuBois ensuring individual "plants" were in compliance. From this section, it is clear DuBois conducts its business at the plant level. Ecolab wants DuBois to visit each plant, send each one a letter transmitting the Guidance, and wants each plant to acknowledge receipt of the Guidance. (*Id.*).

Section 2.1 is the next time the word "customer" appears in the contract. It states:

> DuBois must send the letter described in Section 1.2 (with the accompanying Guidance) to all **new customers**, and DuBois must send the letter described in Section 1.4 above (with the accompanying Guidance) to all new distributors. In each case, DuBois must do so before the first delivery of Dry Lube to said **new customer** or distributor. **For clarity, a new customer or distributor under this Section includes any plant or distributor location that** (1) did not previously purchase or use DuBois Dry Lube or that resumes purchase or use of DuBois Dry Lube or that resumes purchase or use of DuBois Dry Lube after having previously ceased such use or purchase, and (2) did not previously receive a letter under Section 1.2 or 1.4, as appropriate and return an executed acknowledgement of said letter within the last 12 months.

(D.I. 1-1, Ex. A § 2.1 (emphasis added)).

Section 2.1 supports that "customer" in § 3.2 is best understood at the individual plant level, because this section equates "new customer" to a plant. The first part of the bolded sentence above reads "For clarity, a new customer or distributor under this Section includes" and then states "any plant or distributor location that . . . ." "New customer" for Anheuser Busch is being decided at the "plant" level, not at the corporate level.

Section 3.1, which immediately precedes § 3.2, requires DuBois to give "notice to plant personnel responsible for any plant not in compliance with the Guidance." (D.I. 1-1, Ex. A §3.1).

Section 3.1 does not use the word "customer." Section 3.1 requires that DuBois act at the plant level to fix any noncompliance with the Guidance.

Section 3.2 is the next place in the Settlement Agreement "customer" appears. It is the section the parties dispute. It reads:

> If a second violation is discovered at the same customer, DuBois must not sell Dry Lube to the customer again until DuBois can be reasonably assured the customer can remain in compliance.

(D.I. 1-1, Ex. A § 3.2).

Section 3.2, like § 3.1, is designed to have a remedial purpose. The two sections work together. The "second violation" presumes a "first violation." But the word "violation" is not previously mentioned. The "second violation" appears to refer to the immediately prior section's reference to a "plant not in compliance." Section 3.2 requires DuBois to have reasonable assurance that a "customer" who has committed two violations has come into compliance and will be able to stay in compliance before DuBois can sell Dry Lube to the same customer. Put in context with § 3.1, the remedial purpose only makes sense at the plant level. That is where the violations would occur and that is where they would be discovered. Section 3.1 makes it clear that plants are responsible for complying with the Guidance. Therefore, it follows that DuBois would need to be reasonably assured the plant can be compliant before selling Dry Lube to it after a second violation.

The Settlement Agreement in § 2.1 describes the plants as being the entities that purchase Dry Lube from DuBois. That accords with the ordinary understanding of a "customer," which is, "a person or organization that buys goods or services from [another]." *Customer*, Oxford Learner's Dictionaries (Oxford University Press 2023). The organization that is buying the goods here is the

individual Anheuser Busch plant, not Anheuser Busch. That's the way the Settlement Agreement talks about it.[6]

There is a reference to a "customer" or "customers" in §§ 3.3, 5, and 6 of the Settlement Agreement, but the parties do not cite those references, and they do not appear to have any impact on resolving the dispute.

Both in the context of § 3.2 and in the rest of the Settlement Agreement, "customer" is best understood as a plant. I therefore construe "customer" in § 3.2 to mean an individual plant. When the plant is part of a corporation, then it is a "corporate customer." When the plant has not previously purchased Dry Lube, it is then a "new customer," even if other plants owned by the same corporation are old customers.

Ecolab makes two arguments that customer is best understood as "a corporate entity that may own one plant or multiple plants." (D.I. 168 at 16). Ecolab first argues that from the Agreement as a whole it is clear the parties knew the difference between "customer" and an individual "plant." (*Id.*). Thus, to define customer as a plant would turn the use of "customer" in § 3.2 into mere surplusage. Second, Ecolab argues corporate customers and individual plants are all categories of customers that fall within the scope of "customer," and that the term "plant" could have been used in § 3.2 if the parties wanted to indicate a second violation would be determined at the plant level. (D.I. 197 at 8).

I do not think the Agreement reveals that customer and plant are distinct. Therefore, defining customer as a plant does not turn customer into mere surplusage. Rather, the Agreement makes it clear that customer is a category that includes plants, some of which will be corporate

---

[6] Based on various arguments that have been raised about service reports and the compliance document (*see* D.I. 260), my reading of the Settlement Agreement seems to be consistent with what I have so far learned about the operation of DuBois's business.

customers and some of which will be new customers. It would be an odd usage, for example, to refer to a plant that starts to purchase DuBois products as a "new plant," but not to refer to it as a "new customer."

If the parties wanted to indicate that § 3.2 would be triggered by "multiple instances of noncompliance with the Settlement Agreement by a customer . . . even if the instances of noncompliance occurred at two different facilities operated by that customer," (D.I. 168 at 17), they could have written it that way. Given that what the parties wanted from the Settlement Agreement going forward was to allow DuBois to continue its business without infringing Ecolab's patents, that the parties recognized that non-compliance might easily occur, and that whether it occurred was a plant-level event, it makes sense that that plant-level non-compliance would be the subject of § 3.2. Education of a plant manager at one Anheuser Busch plant in Boston would not be likely to have much impact on the education of an Anheuser Busch plant manager in Los Angeles.

If necessary, the parties should propose a jury instruction as to the proper understanding of "customer" in § 3.2.

### 2. Breach

Ecolab moves for summary judgment that DuBois breached six provisions of the Settlement Agreement. (D.I. 168 at 6-15).

### a. §§1.1, 1.2(A), 1.2(B), 1.4, and 1.7 of the Settlement Agreement

Five of the Settlement Agreement's provisions (§§ 1.1, 1.2(A), 1.2(B), 1.4, and 1.7) required that DuBois take various actions "within 60 days of the Effective Date" of the Settlement Agreement. (D.I. 1-1, Ex. A §§ 1.1, 1.2(A), 1.2(B), 1.4, and 1.7). The Effective Date was March 24, 2020. (*Id.* at 1). Thus, the actions needed to be taken by May 23, 2020. Compliance with these

provisions was to take place during the "COVID-19 Coronavirus Emergency." (D.I. 1-1, Ex. A §7). But compliance for four of the five provisions (§§1.1, 1.2(A), 1.2(B), and 1.7) could be delayed by the procedure set forth in § 7 of the Settlement Agreement. (*Id.*)  Pursuant to that section, compliance was extended to July 15, 2020. (*Id.*). Ecolab now advances the theory that the extension of time does not count because DuBois breached § 7 in obtaining the extension. (D.I. 168 at 9). That theory was not pled in the Complaint. I denied a motion to amend the complaint related to that theory.  (D.I. 151). It is too late now to make a breach of contract claim on an unpled theory.

All the evidence Ecolab points to in its brief relating to the four extended provisions (§§1.1, 1.2(A), 1.2(B), and 1.7) occurred before July 15, 2020. (D.I. 168 at 9-11). Thus, there is no basis to grant this portion of the summary judgment motion, and I therefore deny it.

As to the fifth provision, Section 7 did not permit the extension of § 1.4. (D.I. 1-1, Ex. A §7). Section 1.4 required DuBois to send letters with certain information to its distributors. (*Id.* at §1.4). The evidence is that DuBois did not do so. DuBois argues that there is no evidence of damages. (D.I. 184 at 10). DuBois's response does not defeat summary judgment. Ecolab can request nominal damages. As I said at the pretrial conference, if in fact Ecolab has to plead that it is seeking nominal damages,[7] I would allow Ecolab to amend its complaint to seek nominal damages. But I do not think that is the end of the issue here. "The question of whether a court should grant a motion for summary judgment rests in the sound discretion of the court, even if the movant has made out a case for summary judgment." *Consol. Rail Corp. v. Maddox*, 116 F.R.D. 672, 674 (D. Del. 1987). I have previously explained why I think there is some discretion to deny

---

[7] I rather doubt that one has to specifically plead nominal damages, but I do not need to decide that.

partial summary judgment when it will have no practical impact on the trial. *See Adams v. Klein*, 2020 WL 2404772, at *4 (D. Del. May 12, 2020). For much the same reasons as I expressed there, I am exercising my discretion not to grant a partial summary judgment on a minor piece of the case. I deny summary judgment on §1.4 as well.

### b.  Section 3.2 of the Settlement Agreement

Ecolab also moves for summary judgment related a sixth provision of the Settlement Agreement. Ecolab argues that DuBois breached §3.2 by "continuing to sell dry lubricants to customers whose facilities had experienced two or more instances of noncompliance with the Settlement Agreement." (D.I. 168 at 6). A breach of contract claim requires "the existence of a contract, the breach of an obligation imposed by that contract, and resulting damages to the plaintiff." *In re Mobilactive Media, LLC*, 2013 WL 297950, at *14 (Del. Ch. Jan. 25, 2013). Neither party disputes that the Settlement Agreement was a valid contract. (D.I. 10 at Answer to ¶ 78). The parties do dispute whether there was a breach and damages resulted.

To refresh, §3.2 of the Settlement Agreement states: "If a second violation is discovered at the same customer, DuBois must not sell Dry Lube to the customer again until DuBois can be reasonably assured the customer can remain in compliance." (D.I. 1-1, Ex. A, § 3.2). "Violation" is not a word that otherwise appears in the Settlement Agreement, but it appears to mean something that is contrary to the "Guidance." The Guidance states that DuBois's customers must apply any silicone-containing lubricant for intermittent application to a conveyor ("Dry Lube") by using a brush mechanism wherein the brush bristles of each brush remain substantially in contact with the conveyor surface whenever the lubricant is being applied during conveyor operation. (*Id.* at § 1.1). Given the construction of "customer" as an individual plant, *supra* III.A.1, for DuBois to breach §3.2 of the Settlement Agreement, Ecolab would have to show that DuBois sold Dry Lube to a plant after DuBois discovered a second violation and before DuBois had reasonable assurance that

the plant can remain compliant thereafter. "[R]easonably assured" in §3.2 requires DuBois to have both an actually held (or subjective) belief that is objectively reasonable that the violation would not occur again before it continued selling to the same customer. *See Owatonna Clinic-Mayo Health Sys. v. Med. Protective Co. of Fort Wayne, Indiana*, 2009 WL 2215002, at *5 (D. Minn. July 22, 2009). DuBois argues that it only needed a subjective belief. (D.I. 184 at 6, citing *Charlotte Broad., LLC v. Davis Broad. of Atlanta, L.L.C.*, 2015 WL 3863245, at *7 (Del. Super. Ct. June 10, 2015)). But I do not think *Charlotte Broad* is on point. In that case, the clause at issue gave parties the "sole discretion" to terminate the agreement, which favored a reading of subjective belief. *Id.* The language in §3.2 is clearly much different. It does not support DuBois's argument.

Ecolab mentions an example of a DuBois representative continuing to sell dry lubricant to the Anheuser Busch plant in Van Nuys, California, after observing violations in July 2020 and October 2020. (D.I. 168 at 13, citing the record). Ecolab asserts DuBois had no reasonable assurance of compliance but did not stop selling the product. (*Id.* at 13-14, citing the record). Without citing to the record, DuBois states that DuBois took steps to speak with plant personnel and correct the violation. (D.I. 184 at 7). However, DuBois also points to the deposition of Rob Justus, Chief Commercial Officer of DuBois, who states that when customers have a brush broken on their line it is "immediately corrected," and "they reinforced [their] ability and willingness to comply with the agreement." (D.I. 177-15, Justus Dep. Vol II at 122:2-10). There is a genuine dispute of material fact whether DuBois continued to sell product to customers with two violations without being reasonably assured that the customer would be compliant. Therefore, I will not grant summary judgment for breach of §3.2.

### c. Harm

Ecolab asserts there is no genuine dispute of material fact they were harmed by the breach. (D.I. 168 at 15). But, since I am not finding that breach is undisputed, I do not need to reach the issue of harm.

### B. Patent Infringement

#### 1. Direct Infringement

Ecolab moves for summary judgment that there was direct infringement of the '257, '381, and '215 patents. (D.I. 168 at 17). DuBois moves for summary judgment that there was no direct infringement of the asserted patents. (D.I. 172 at 6).

DuBois states that Ecolab has provided no evidence that DuBois itself "applies or sprays any of the Accused products." (D.I. 172 at 6). Rather, Ecolab contends that DuBois's customers directly infringe. *Id.* Ecolab points to evidence in the record that, at most, shows that DuBois set up and suggested running the Accused Products as a spray even though customers already had a spray system. (D.I.171-8 Ex. 40 at 67:11-68:11, 195:20-196:9).

Ecolab also offers evidence of what it states are a few instances of direct infringement. For example, it asserts the June 6, 2020 set up at Niagara's Aurora, Colorado plant was direct infringement. (D.I. 197 at 11). Ecolab cites an email where one DuBois employee asks if the filler output conveyors that are set up with metering tips instead of brush heads should be removed. (D.I. 171-8 Ex. 39). Another employee replies, saying to "move the station to the back side of the conveyor." (*Id.*). DuBois states that this fails to establish DuBois directly infringed and implies that moving the station to the back favors a finding on non-infringement. (D.I. 184 at 23 n.13). DuBois also cites deposition testimony that this email means the application without a brush head would be replaced with a brush. (D.I. 185-11 Ex. UU, Holtslander Dep. at 78:15-81:10).

I find there is a dispute of material fact as to direct infringement. Thus, I deny summary judgment for direct infringement.

### 2. Indirect Infringement

Ecolab moves for summary judgment that there was induced infringement. (D.I. 168 at 21). Dubois moves for summary judgment that there was no induced or contributory infringement. (D.I. 172 at 7, 12).

"In order to prevail on an inducement claim, the patentee must establish first that there has been direct infringement, and second that the alleged infringer knowingly induced infringement and possessed specific intent to encourage another's infringement." *Sanofi v. Lupin Atl. Holdings S.A.*, 282 F. Supp. 3d 818, 826 (D. Del. 2017) (citing *ACCO Brands, Inc. v. ABA Locks Mfrs. Co.*, 501 F.3d 1307, 1312 (Fed. Cir. 2007)).

To establish contributory infringement, the patent owner must show that the defendant supplies a component and meets the following elements: "1) that there is direct infringement, 2) that the accused infringer had knowledge of the patent, 3) that the component has no substantial noninfringing uses, and 4) that the component is a material part of the invention." *Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321, 1326 (Fed. Cir. 2010).

In order to find indirect infringement, there must first be a finding of direct infringement. Because I have denied summary judgment as to direct infringement, and do not otherwise find that there is undisputed evidence of customer direct infringement, I will also deny summary judgment as to indirect infringement.

### C. Motion For Judgment on the Pleadings

DuBois moves for judgment on the pleadings on Ecolab's theory of direct divided infringement. (D.I. 172 at 4). The rule requires that such a motion be filed so as not to delay the

trial. Had DuBois filed the motion as a Rule 12(b)(6) motion, Ecolab would have had the

opportunity long ago to correct any pleading deficiency. That is obviously not possible now. The

motion is filed too late, and it will be denied.

### D. Daubert

#### 1. Rouillard

Ecolab moves to exclude Jacques Rouillard, DuBois' technical expert, from testifying on

three grounds. (D.I. 168 at 24). First, Ecolab moves to exclude Mr. Rouillard from testifying that

"DuBois' dry lubricant products do not infringe the Asserted Patents when applied by a brush or

cloth." (*Id.*). Second, Ecolab moves to exclude Mr. Rouillard from testifying about "his

understanding that DuBois customers apply the Accused Products using a brush or a cloth." (*Id.*).

Third, Ecolab moves to exclude "his understanding about the availability of third-party dry

lubricant products." (*Id.*).

##### a. Mr. Rouillard's testimony that "DuBois' dry lubricant products do not infringe the Asserted Patents when applied by a brush or cloth."

Federal Rule of Evidence 702 only permits experts to testify when it helps the trier of fact

to understand the evidence or to determine a fact in issue. Fed. R. Evid. 702(a). Federal Rule of

Evidence 402 states, "Irrelevant evidence is not admissible." Fed. R. Evid. 402. Ecolab argues

that whether using a brush or cloth to apply the Accused Products infringes the Asserted Patents

is not a fact at issue, nor is it relevant, because Ecolab does not assert that this method of

application infringes the Asserted Patents. (D.I. 168 at 24). In fact, "Ecolab agrees that

application of dry lubricants with a cloth or brush does not infringe the asserted patents." (D.I.

197 at 15).

DuBois replies by stating it is both relevant and a fact at issue whether applying to

Accused Products with a brush or cloth would infringe the Asserted Patents. (D.I. 184 at 30).

First, DuBois argues Ecolab has put the method of application of the Accused Products at issue. (*Id.*). If the Accused products are sprayed from a spray bottle onto a brush or cloth, and that brush or cloth is used to wipe the conveyor, this is not infringement. (D.I. 177-2, Ex. E Rothstein Dep. at 81:23-82:18, D.I. 86 at 4). But if the Accused Products are sprayed directly onto the container and then wiped with a brush or cloth, Ecolab alleges this is infringement. (D.I. 184 at 30). Second, DuBois states that application using a brush or cloth is relevant to Ecolab's theories of induced and contributory infringement, because the testimony goes to the question of whether there are substantial non-infringing uses. (D.I. 184 at 31).

The parties dispute whether spraying the Accused Products directly onto the container and then wiping with a brush or cloth is infringing. The testimony is relevant because it goes to the infringement inquiry. I will allow testimony about whether spraying the Accused Products directly onto the container and then wiping with a brush or cloth is infringing.

The parties agree that spraying the Accused Products onto a brush or cloth, and using brush or cloth to wipe the conveyor is not infringing. While thus not relevant to the infringement question, the testimony provides relevant context for the parties' actual dispute. I will allow Mr. Rouillard to testify that spraying the Accused Products onto a brush or cloth, and using the brush or cloth to wipe the conveyor, is not infringing.

### b. Mr. Rouillard's understanding that DuBois customers apply the Accused Products using a brush or a cloth.

Ecolab seeks to exclude Mr. Rouillard from testifying about his understanding that DuBois customers apply the Accused Products using a brush or a cloth, arguing that such testimony would not be based on his technical, scientific, or other specialized knowledge. (D.I. 168 at 25). Rather, he would simply be restating the lay testimony and documents given to him

by DuBois and lending them "the gloss of expert approval." (*Id.*). What the DuBois customers do is just a factual issue, and the determination of facts is for the jury to make. (D.I. 197 at 16).

DuBois replies that Mr. Rouillard's understanding of how DuBois customers apply the products is the evidentiary support behind his infringement opinions about the use of a brush or cloth, and he is allowed to testify about the factual underpinnings of his opinion. (D.I. 184 at 31). DuBois also states that Mr. Rouillard would not simply be restating the documents he used to form his opinion, because he has personal experience with the application of two of the three Accused Products at customer facilities. (*Id.*). His testimony regarding the third Accused Product is based on "documents or information from others" (*Id.*).

Ecolab cites *SRI Int'l Inc. v. Internet Sec. Sys., Inc.*, 2011 WL 5166436, at *3 (D. Del. Oct. 31, 2011). *SRI* explains, "Although an expert witness may offer an opinion incorporating proffered facts, because [the expert] did nothing more than reiterate the lay testimony and provide a conclusory opinion based on the lay testimony, he may not testify on these subjects." I take note of this case.

Mr. Rouillard's opinion at issue is: "It is my opinion that TM Smart Track provided by DuBois is only applied with brushes. (Justus Deposition, Exhibit 309.)" (D.I. 171-8, Ex. 38, Rouillard Rpt. at ¶57). It seems unlikely that Mr. Justus has any personal knowledge basis to be offering his opinion as to what the customers do. But without hearing Mr. Justus, it is hard to make a determination on the issue of Mr. Rouillard's opinion. Thus, while I think it very likely that Mr. Rouillard's proposed testimony would run afoul of the *SRI* explanation, I think this is more of an evidentiary issue than a Daubert issue. Ecolab may object at trial as it thinks warranted and must object to the extent it wants to preserve this objection.

### c. Rouillard's "understanding about the availability of third-party dry lubricant products."

Ecolab seeks to exclude Mr. Rouillard's testimony about "his understanding about the availability of third-party dry lubricant products." (D.I. 168 at 27; D.I. 171-8, Ex. 38, Rouillard Rpt. at ¶46-47). Mr. Rouillard identified eight different products as available competitors to Ecolab and DuBois's products. (D.I. 171-8, Ex. 38, Rouillard Rpt. at ¶46-47). Ecolab identified gaps in Mr. Rouillard's knowledge about the alternatives. (D.I. 168 at 26-27). Ecolab asserts that Mr. Rouillard's testimony about suitable alternatives does not meet the requirements of Rule 702. (D.I. 168 at 27). It is not based in any scientific, technical, or other specialized knowledge; it is not based on sufficient facts or data; and it is not a product of reliable principles or methods that were reliably applied to the facts of this case. (*Id.*). Ecolab also states that Mr. Rouillard testifying on this topic would impermissibly give the gloss of expert opinion to fact testimony. (D.I. 197 at 18).

DuBois responds that Mr. Rouillard does have expert knowledge on the issue, because he has 47 years of industry experience involving "testing, developing, and resolving technical issues for commercial products in the food and beverage space, including conveyor lubricants." (D.I. 184 at 32, D.I. 177-20 at ¶¶ 4-5). DuBois states that Ecolab put at issue the availability of competing products, but that is an irrelevant argument.

After considering Ecolab's criticisms of Mr. Rouillard's selection of alternative dry lubricant products and the relevant sections of Mr. Rouillard's report and deposition, I find some of "his understanding about the availability of third-party dry lubricant products" is not based on sufficient facts or data. (D.I. 168 at 25-27; D.I. 171-8, Ex. 40 at 179:5-192:13; D.I. 171-8, Ex. 38, Rouillard Rpt. at ¶46-47). Nor is some of it a product of reliable principles or methods that were reliably applied to the facts of this case.

21

For DryFormance, Mr. Rouillard is aware that it is being used in the United States but does not know to what extent. (D.I. 171-8. Ex. 40 at 180:4-181:3). With respect to Dry Tech H1 and ChemTreat, Mr. Rouillard does not know if it is being used in the United States. (*Id.* at 181:3-10). Mr. Rouillard had heard of the CHP product before being hired as an expert in this case, and in reviewing materials provided to him to make his expert report, he obtained information about its use in the United States. (*Id.* at 181:14-184:2). For CP4600, ChemTreat, and the SKF product, he relies upon marketing materials to determine that these are available competitors. (*Id.* at 184:2-186:13). He does not know if SKF is a silicone lubricant. (*Id.* at 186:20-21). Mr. Rouillard does not know of any plants using the Shepard Bros products, the Anderson Chemical product, or the Rochester Midland product. (*Id.* at 188:19-189:16, 187:4-188:6, 191:10-192:10). Mr. Rouillard does know of a plant that uses the Madison Chemical product. (*Id.* at 189:18-191:8).

Mr. Rouillard's report shows he considered that Diversey's products, DryFormance and DryTech H1, can be used in Ecolab's dispensing system, and Ecolab lists DryTech H1 as a competitive product. (D.I. 171-8, Ex. 38, Rouillard Rpt. at ¶46). He also considered that Ecolab has seen a customer install a CHP system. (D.I. 171-8, Ex. 38, Rouillard Rpt. at ¶47).

Mr. Rouillard can testify that the Diversey products and CHP are available competitors. He may not testify that the rest of the products he mentions are suitable alternatives, as his testimony is not based on sufficient facts or data.

### 2. Gerardi

#### a. Contract Damages

Ecolab moves to exclude Mr. Gerardi's testimony on contract damages because it is based on an understanding that "customer" in §3.2 means individual plants, when that is not the

correct understanding of "customer." (D.I. 168 at 28). However, I found that the correct

interpretation of "customer" in §3.2 is at the plant level. Therefore, I deny Ecolab's motion to

exclude the contract damages testimony of Mr. Gerardi.

### b. Reasonable Royalty

Ecolab moves to exclude one mathematical analysis performed by Mr. Gerardi. (D.I. 168

at 29-32). The analysis at issue is in response to Ms. McCloskey's analysis. Ms. McCloskey

calculated how much Ecolab would have expected to lose by licensing DuBois. Essentially, her

model was to assume that for every two gallons DuBois would sell as a result of the license,

Ecolab would sell one less gallon itself. The assumption was based on Ecolab having a 50%

market share, and that it would lose sales in proportion to its market share. Ms. McCloskey

calculated the "incremental profit" per gallon Ecolab historically obtained. With that

information, Ms. McCloskey could calculate the impact on Ecolab of granting a license.

Oversimplifying, Ecolab's historical incremental profit was $12 per gallon, and thus every time

DuBois would sell two gallons, Ecolab would lose the profits from the sale of one gallon. Put

differently, for each gallon DuBois would expect to sell, Ecolab would expect to lose $6 of

profit. From there, it appears, Ms. McCloskey took the average sales price of DuBois's product

($28.45 per gallon) to suggest a royalty rate based on Ecolab recouping the $6 per gallon it

would be losing by licensing DuBois. Mr. Gerardi, it appears, critiqued Ms. McCloskey for not

using DuBois's market share (6.6%) to calculate what Ecolab would lose.[8] At least as a part of a

---

[8] DuBois's market share is, of course, directly related to what the royalty base will be. Thus, DuBois's market share will factor into the damages calculation. The smaller DuBois's market share, the less the damages will be. If DuBois sold one gallon, Ecolab would lose $6. If DuBois sold 10,000 gallons, Ecolab would lose $60,000. In either situation, Ecolab would be looking at a royalty in the neighborhood of $6 per gallon.

critique of Ms. McCloskey's analysis, there is no logic to that particular criticism. It makes no

methodological sense. To that extent, I will grant the *Daubert* motion.

Ecolab seeks broader relief. (D.I. 168 at 31-32). To the extent Mr. Gerardi's proposed 2.3

to 3.3% royalty rate is based on the above analysis, it too must be excluded.  But DuBois says the

2.3 to 3.3% royalty rate is based on other things too.

I considered Mr. Gerardi's computation of his 2.3 to 3.3% royalty rate to determine if Mr.

Gerardi calculated his royalty rate of 2.2 to 3.3% solely using DuBois' 6.6% market rate, i.e., the

same methodological error he made in critiquing Ms. McCloskey's opinion. It appears that he

did so.

> As described above, assuming the appropriateness of McCloskey's calculation,
> Ecolab's expected loss of profits (stated on a per gallon basis) would decrease to $0.66 -
> $0.93 when considering DuBois' market share, not Ecolab's market share, yielding a
> royalty rate range of 2.3- 3.3% of DuBois' sales.

(D.I. 171-7, Ex. 28, Gerardi Rpt. at ¶92).

Two of the other things DuBois states Mr. Gerardi used to come up with his royalty rate

are actually critiques of the two other methods Ms. McCloskey used to support her initial

calculation of a royalty. (D.I. 184 at 35-36). These are not critiques of Ms. McCloskey's initial

calculation that I have described above. Ms. McCloskey used the Analytical Approach as well as

the ICC-Ecolab Settlement Agreement to confirm her reasonable royalty calculation of 18%.

(D.I. 171-7, Ex. 27, McCloskey Rpt. at 33-34). For the Analytical Approach, Mr. Gerardi

critiques Ms. McCloskey's use of the Thonhauser Agreement, as well as the comparison of

DuBois' Dry Trac profit margins to the profit margins of DuBois' entire Food & Beverage line.

(D.I. 171-7, Ex. 28, Gerardi Rpt. at ¶93-94). For the ICC-Ecolab Settlement Agreement, Mr.

Gerardi critiques her use of the Settlement Agreement itself as incomparable "to a royalty rate

negotiated in a hypothetical negotiation for the patents-in-suit." (*Id.* at ¶95). These criticisms, even if valid, do not offer any support for Mr. Gerardi's proposed royalty rate.

The only other consideration DuBois argues Mr. Gerardi used to justify his royalty rate is that Ms. McCloskey did not take into consideration the cost of designing around the patents-in-suit. (*Id.* at ¶¶105-106). Presumably, this would make DuBois unlikely to agree to Ms. McCloskey's higher rate of 18%, and more likely to agree with Mr. Gerardi's rate of 2.3 to 3.3%. However, the total cost to design-around was only $6496. (*Id.*) Given the total reasonable royalty damages Mr. Gerardi computes is $43,443, and Ms. McCloskey's minimum reasonable royalty damages is $782,265, I am not persuaded the cost to design-around played any part in Mr. Gerardi's proposed reasonable royalty.

I find that Mr. Gerardi's calculation of the 2.3 to 3.3% royalty rate is based on using DuBois' market share of 6.6%. This does not make methodological sense. The royalty rate has no other identifiable basis. I exclude Mr. Gerardi's opinion that the royalty rate should be 2.3 to 3.3%.

### 3. McCloskey

#### a. Patent Infringement Damages

DuBois moves to exclude Ms. McCloskey's opinions regarding patent infringement damages. (D.I. 172 at 23). Ms. McCloskey calculated three alternative royalty bases for her patent infringement damages. (D.I. 172 at 21). DuBois argues that the royalty bases are overstated because she includes all of DuBois's sales of the Accused Products in her royalty base, rather than apportioning the royalty base to the sales of Accused Products associated with instances of alleged infringement. (D.I. 172 at 25). In other words, Ms. McCloskey's royalty base includes products later used with a non-infringing method. (*Id.*).

Ecolab responds by stating that it is entitled to present alternative damages theories, using the Georgia-Pacific factors to assess reasonable royalty damages. (D.I. 186 at 23). I do not find these arguments persuasive, as DuBois is not contesting that these are alternative theories, but that the royalty base is improperly high.

I find persuasive DuBois' argument that this case is like *Niazi Licensing Corp. v. St. Jude Med. S.C., Inc.*, 30 F.4th 1339, 1357 (Fed. Cir. 2022). In that case, the Federal Circuit affirmed the exclusion of an expert's damages report for infringement of a method claim when the expert did not separate the devices that had been used to practice the method from the ones that were not so used. *Id.* "Damages should be apportioned to separate out noninfringing uses, and patentees cannot recover damages based on sales of products with the mere capability to practice the claimed method. Rather, where the only asserted claim is a method claim, the damages base should be limited to products that were actually used to perform the claimed method." *Id.* Likewise here, all the asserted claims are method claims.

It is true that the Federal Circuit has "never laid down any rigid requirement that damages in all circumstances be limited to specific instances of infringement proven with direct evidence." *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1334 (Fed. Cir. 2009). *Lucent*, however, is consistent with *Niazi* (which quoted this passage). "Lucent had the burden to prove that the extent to which the infringing method has been used supports the lump-sum damages award." *Lucent*, 580 F.3d at 1335.

Because Ms. McCloskey used all of DuBois' sales of the Accused Products in her royalty base, I exclude all her patent damages opinions. (D.I. 177-23, Ex. CC,  McCloskey Rpt. at 19, 37-38).

### b.  Breach of Contract

DuBois moves to exclude Ms. McCloskey's breach of contract damages because they are based on a flawed understanding that "customer" in §3.2 means the corporate entity that owns a plant, and not an individual plant. (D.I. 172 at 33). However, I found that the best interpretation of "customer" in §3.2 is the entity that actually is the customer, which the Settlement Agreement indicates is at the plant level. Thus, I agree with DuBois that Ms. McCloskey's use of a different understanding of "customer" makes her damages calculations overstated and unreliable. Thus, I will exclude Ms. McCloskey's breach of contract damages to the extent they are predicated on that incorrect understanding.

### c.  Spray Bottles

DuBois states Ms. McCloskey's contract damages include using spray bottles to apply Dry Lube, but spray bottles are not included in the Settlement Agreement and their use would not violate the Agreement. (D.I. 172 at 37-38). Thus, DuBois argues that her breach of contract damages relating to spray bottles should be excluded. (*Id.).* DuBois states that the plain meaning of the Agreement makes it clear spray bottles are not included. (*Id*. at 37). The Agreement refers to "application equipment" and "application station," which are not spray bottles. (*Id.* at 39).

Ecolab states spray bottle applications are covered by the Settlement Agreement, such that use of a spray bottle to apply Dry Lube would violate the agreement. (D.I. 186 at 39). I agree. Section 1.1 states that Dry Lube must be applied using a brush mechanism. (D.I. 1-1, Ex. A § 1.1). The rest of the sections discuss the brush mechanism, the only permissible way to apply Dry Lube under the Agreement.

I deny the *Daubert* motion to the extent it is based on the argument that spray bottles are permitted under the Settlement Agreement.

27

### d. Unjust Enrichment

DuBois moves to exclude Ms. McCloskey's unjust enrichment theory, arguing that unjust enrichment that is a disgorgement of profits is not a remedy for breach of contract under Delaware law. (D.I. 172 at 40). Ecolab states that the unjust enrichment theory is restitutionary, which is allowed. (D.I. 186 at 40).

I am persuaded that Ms. McCloskey was stating a disgorgement of profits theory. The relevant part of her report states, "By failing to cease selling its Dry Lubricants to customers who were noncompliant on more than one occasion, DuBois was unjustly enriched in an amount equal to its profits on all Dry Lubricants sold to such customers after the customer's second instance of noncompliance." (D.I. 171-7, Ex. 27, McCloskey Rpt. at 18-19). This is not allowed as a remedy for breach of contract under Delaware contract law. "A party generally cannot seek recovery under an unjust enrichment theory if a contract is the measure of [the] plaintiff's right." *Pedrick v. Roten*, 70 F. Supp. 3d 638, 652–53 (D. Del. 2014) (cleaned up). I grant the Daubert motion to exclude unjust enrichment damages for breach of contract. In addition, to the extent that Ecolab is asserting a claim, or alternative remedy, for unjust enrichment, DuBois is entitled to summary judgment barring such a claim/remedy.

## IV.   CONCLUSION

An appropriate order will issue.